**UNITED STATES of America,
Plaintiff,**

v.

**Donald WHITMORE, Defendant.**

**No. 03–20048–BC.**

United States District Court,
E.D. Michigan,
Northern Division.

April 16, 2004.

Federal Defender, Federal Defender Office, Flint, MI, for Defendant.

Janet L. Parker, U.S. Attorneys Office, Bay City, MI, for Plaintiff.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND SCHEDULING PLEA CUT–OFF DATE, FINAL PRETRIAL CONFERENCE, AND CRIMINAL JURY TRIAL

LAWSON, District Judge.

The defendant in this case is charged with three state law offenses that allegedly occurred within the boundaries of a national forest and therefore on federal land: indecent and obscene conduct in a public place; carrying a firearm in a motor vehicle; and drunk driving. The first of these charges is based on the observations of a United States Department of Agriculture Forest Service officer, who hid herself in the forest at night to detect poachers, but who instead observed the defendant answering an urgent call of nature alfresco. Thereafter, the defendant returned to his vehicle and drove off but was quickly pursued and stopped by the forest service officer who emerged from her lair, and who discovered the other two violations in the course of her ensuing questioning and inspection of the defendant's vehicle. The defendant has filed a motion to suppress the evidence of the chemical tests that support the basis of the drunk driving prosecution and the weapon that was found between the front seats of his vehicle. He concedes that there was probable cause to administer the chemical tests once he was stopped and questioned, and that the weapon was in plain view. He argues, however, that there was no valid basis for the initial stop, which, he contends, violated the Fourth Amendment, and that the developments that flowed therefrom are tainted by the Fourth Amendment violation. The Court agrees and finds that the stop of the defendant in this case was not

supported by reasonable suspicion. The ensuing vehicle search and chemical tests of the defendant, therefore, were tainted by the Fourth Amendment violation and the evidence discovered thereby must be suppressed. The Court conducted an evidentiary hearing on March 8, 2004, and heard the following testimony.

## I.

Brandy Hill has been a United States Forest Service law enforcement officer for the past six years. She is five foot, three inches tall; she obtained a degree in criminal justice from an institution that was certified by the Michigan Law Enforcement Training Council; she underwent training at the Federal Law Enforcement Center in Glenco, Georgia; and on October 18, 2002 she was assigned to the Mio Ranger District in the Huron–Manistee National Forests in Oscoda County, Michigan. That evening she was looking for poachers in the national forest. Her method was to park her official vehicle out of sight on a two-track off one of the dirt (unpaved) roads within the national forest boundaries and watch for people "shining" deer or driving slowly.

Hill testified that beginning at approximately 7:45 p.m. she was in position just off Lemon Road near the intersection of Briggs Road. The night was completely dark at that time, there were no street lights or buildings in the area, nor were there any camp sights or tents located near where she was stationed. She testified that there were no developments, only road signs along the dirt road.

Hill stated that she saw several vehicles pass by. However, sometime shortly after 8:00 p.m. she noticed the defendant's vehicle, a Nissan Pathfinder. She said that it had not passed by her, but she first noticed it from approximately one mile away when it appeared to stop in the road. Hill testified that she saw brake lights illuminate and then go out as if the driver put the transmission of the vehicle in "park." Hill then said that she slowly drove her vehicle out of the two-track and approached the rear of the defendant's vehicle. She did not illuminate any of her lights and proceeded "in the black" so as to sneak up on the vehicle undetected. As she approached, she saw the defendant standing in the dirt road near the driver's door of his vehicle, urinating. Hill said that she saw a stream but did not observe any of the defendant's body parts, as his back was to her.

At that point, she was approximately 15 to 20 yards to the rear. She illuminated her lights, including her over head lights, which apparently startled the defendant and prompted him to return to his vehicle and drive it along the road away from her. Hill sounded her siren a couple of times, and the defendant proceeded to the intersection of Briggs Road, also a dirt road approximately a quarter mile away, where he turned left into the intersection and stopped along the left shoulder of the road. Hill said that she was in the process of radioing to her dispatch unit to report the defendant's license plate number when she noticed the defendant had alighted from his car and was standing next to the door of her vehicle. Hill told the defendant to step to the front of her vehicle while she finished making her radio call. When she finished, Hill got out of her vehicle and questioned the defendant. She described the defendant as becoming progressively more irritated, and she smelled the odor of alcohol about him. At that point, Hill suspected that the defendant was intoxicated. The defendant explained to her that he was out for a drive. He said that he was familiar with the area and frequently bow hunted there. He offered to show her his bow. Hill stated that during this conversation, the defendant slurred his speech.

Hill went with the defendant to the rear of his Nissan Pathfinder, which he opened to display his bow. At that point, Hill asked to see the defendant's driver's license, his archery tag, and his bow permit. The defendant produced these items from his wallet with some difficulty.

Hill also noted that the defendant had a female passenger in the vehicle. The passenger apparently was talking throughout this encounter to the point where she disturbed Hill. Hill said that she then approached the defendant's vehicle to ask the passenger for her identification. At that point, the defendant jumped into the driver's seat of his car. Hill thought the defendant was going to flee, and she testified that when she shined her light into the defendant's vehicle, she saw the barrel of a gun. Hill seized the weapon, a .410 single-shot shotgun that was loaded with one slug (typically used for deer hunting), and had three other cartridges stowed in the stock of the weapon. The firearm was stored in the front of the vehicle between the seats, muzzle down, butt up. Hill testified that in Michigan it is not appropriate to transport a firearm in that fashion, that is, loaded, uncased, and in a game area.

Hill ordered the defendant back out of his vehicle, and he complied. The defendant stood between his vehicle and Hill's while Hill secured the weapon in her vehicle. Hill previously had contacted her dispatcher to ask for assistance. She called in again to report the weapon and to request that her backup unit come quickly. She explained that she felt intimidated due in part to her diminutive stature and because the defendant stood approximately five feet, eight inches tall and was behaving as if intoxicated.

When Hill asked the defendant if he had been drinking, the defendant responded that he had consumed "a couple of beers." He acknowledged open intoxicants in the vehicle, and when asked, the passenger produced a bottle of ginger brandy and a bottle of peppermint schnapps.

Hill stated that she did not conduct a typical search of the vehicle because the passenger was suffering from a handicap and could not walk, having no feeling in her legs. Therefore Hill did not order this passenger out of the vehicle. Shortly thereafter, an Oscoda County sheriff deputy arrived at the scene and administered a preliminary breath test to the defendant. The defendant was subsequently arrested and taken back to the Oscoda County Sheriff's Department where he was administered a formal breath test on a datamaster machine.

On cross-examination, Hill acknowledged that she was not certain from which direction the defendant had come. She first paid attention to the vehicle after the defendant had parked it with his headlights pointing away from her. During the entire encounter, which took approximately twenty minutes, no vehicles passed down the road, nor did any hikers, joggers, or off-road vehicle riders pass by the area.

Hill acknowledged that there was no posted speed limit on this dirt road and that the speed that cars travel over the road "varies quite a bit." She could not recall the speed of the defendant's vehicle, but speculated that he was driving at a normal speed and that she would not have noticed him had he not stopped to relieve himself.

Hill also testified that near the end of the encounter and due to its length, the defendant's passenger complained about the urgent need to answer a call of nature. The stop occurred seven to ten miles away from the defendant's residence. Hill explained that because she was the only female on the scene, she left the defendant in the custody of the Oscoda County sheriff deputy and she assisted the defendant's

passenger in relieving herself in the woods.

The government's attorney challenged the defendant's "standing" to contest the stop and search. Consequently, the defendant was called to testify concerning his interest in the Nissan Pathfinder. Donald Whitmore testified that the vehicle was titled in the name of his wife, Mary Kelly Whitmore. However, the defendant stated that he purchased the vehicle in October 2000 from his son-in-law for $500 in cash. The defendant explained that the Michigan Secretary of State office in Mio, Michigan is only open on Monday, Wednesday and Friday, so he had the vehicle titled in his wife's name because she was available to process the transaction at the Secretary of State's office while the defendant worked. He also explained that he and his wife owned a 1989 Ford van and that he normally drove the Pathfinder (which his wife refused to drive) and his wife drove the van.

The defendant also testified that he insured the Pathfinder in his name through Farm Bureau Insurance Company. He said he drove the vehicle each day, put gas in it, changed the oil, and repaired it. On the date of the incident, October 18, 2002, the defendant had his own personal items in the vehicle including his hunting bow, an old horse blanket, his shotgun, hand tools, and flashlights. He had no spot light in the vehicle, however. He testified that he purchased the bottles of brandy and schnapps, and that he had consumed a "sip" out of the brandy bottle because he "had a cold."

The defendant denied that he had placed the vehicle title in his wife's name because of a poor driving record. He acknowledged that his driver's license had been suspended 15 to 20 years previously, but that his current driving record was good. The defendant was 50 years old at the time of the hearing.

Neither party called any additional witnesses.

## I.

The government initially contends that the defendant lacks "standing" to contest the stop and the search of the vehicle, placing considerable reliance on *United States v. Metzger,* 778 F.2d 1195, 1200 (6th Cir.1985), in which the court of appeals "fail[ed] to see how defendant, absent more than an ownership interest, had a reasonable expectation of privacy in his wife's personal vehicle" that nonetheless was titled in the defendant's name. Although the government has accurately quoted the language from that case, it has wrenched it from its context, as explained more fully below, so as to distort its meaning to the point of misrepresentation.

More to the point, characterizing the question as one of "standing" miscasts the issue. The Supreme Court rejected the concept of "standing" in *Rakas v. Illinois,* 439 U.S. 128, 139–40, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). It is commonly acknowledged that "in determining whether a defendant is able to show the violation of his … Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (quoting *Rakas,* 439 U.S. at 140, 99 S.Ct. 421). The Sixth Circuit has recognized that "the concept of 'standing' has not had a place in Fourth Amendment jurisprudence for more than a decade" and that "the matter of standing in the context of searches and seizures actually involve[s] substantive Fourth Amendment law [in which] … a defendant [must] prove a legitimate expectation of privacy as a prerequisite to challenging assertedly unlawful police conduct." *United States v.*

*Smith,* 263 F.3d 571, 581–82 (6th Cir.2001) (quoting *United States v. Sanchez,* 943 F.2d 110, 113 n. 1 (1st Cir.1991)).

■ Thus, in order to determine whether the defendant may challenge the search and seizure in this case as a violation of the Fourth Amendment, the defendant must establish, first, that he had an actual, subjective expectation of privacy, and second, that the expectation was a legitimate, objectively reasonable one. *Smith,* 263 F.3d at 581 (citing *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)). "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas,* 439 U.S. at 143 n. 12, 99 S.Ct. 421.

The Sixth Circuit has not spoken directly to the issue of whether a man has a legitimate expectation of privacy in a car that he is driving but is owned by his wife. However, an analogous scenario arose in *United States v. Smith, supra.* In that case, the defendant and another passenger were traveling eastbound on Interstate–40 through Tennessee in a rental car that was rented by Smith's wife, who was not in the vehicle at the time. A police officer stopped the vehicle for failing to maintain lane control and thereafter sought permission to search it, which was refused. A drug detection dog called to the scene eventually alerted to both the passenger's side door and the driver's side door, so the officer allowed the dog to enter the car where the dog alerted on a black canvas bag located on the floor behind the driver's seat. The officer opened the bag and found illegal drugs. The district court suppressed the evidence, and on appeal the government challenged the defendant's "standing" to contest the search. The court of appeals acknowledged the general rule that suggests that an unauthorized

driver of a rental vehicle has no legitimate expectation of privacy in the vehicle. However, in rejecting the government's argument the court made the following observations, which shed light on the present matter:

> [W]e refuse to adopt a bright line test, as the government seems to advocate, based solely on whether the driver of a rental vehicle is listed on the rental agreement as an authorized driver. Such a rigid test is inappropriate, given that we must determine whether Smith had a legitimate expectation of privacy which was reasonable in light of all the surrounding circumstances. *See Rakas,* 439 U.S. at 152, 99 S.Ct. 421 (Powell, J., concurring). "In considering the reasonableness of asserted privacy expectations, the [Supreme] Court has recognized that no single factor invariably will be determinative." *Id.*

*Smith,* 263 F.3d at 586. The court found that because the defendant was a licensed driver, was able to present the officer with the rental agreement and provided the officer with sufficient information regarding the vehicle, was given the vehicle by his wife who was listed as the authorized driver, and his wife had given him permission to drive the vehicle, the defendant properly could challenge the search. *Ibid.* The court also affirmed the district court's decision to suppress the evidence based on the illegality of the officer's search.

Similarly, in *United States v. Dunson,* 940 F.2d 989 (6th Cir.1991), the court found that an automobile passenger legitimately could contest the legality of a search of a vehicle where both the driver and the passenger had participated in borrowing the vehicle from its owner and both had personal belongings in its trunk. *Id.* at 994–95.

■ The facts in the record of this case abundantly establish the defendant's actu-

al, subjective expectation of privacy in the Nissan Pathfinder, and that this expectation was legitimate and objectively reasonable. *See Smith,* 263 F.3d at 581. The evidence shows that the defendant was a licensed driver, able to present Officer Hill with the vehicle's registration, and the beneficial owner of the vehicle. Although the Pathfinder was titled in the defendant's wife's name, he testified without contradiction that the mechanics of titling the vehicle in that manner was a matter of convenience, and that within their household the Pathfinder was in fact "his car." The defendant purchased the vehicle himself, he stored his belongings in it, and he was its regular user. He also insured the vehicle and maintained it. It is difficult to imagine a scenario in which the defendant's expectation of privacy in such a vehicle would be rejected as objectively unreasonable.

As noted above, the government's reference to *United States v. Metzger* obscures the inquiry. In that case, the defendant blew up his wife's car as she was driving it home from a store; he was convicted of transporting explosives in interstate commerce with the intent to kill. Police officers searched the vehicle after the explosion and found evidence linking the explosive devices to the defendant. The defendant moved to suppress the evidence obtained from the police search of his wife's vehicle. The defendant testified that although the car belonged to his wife, the vehicle was registered in his name, which is the obverse of the circumstances in the present case. On appeal, the Sixth Circuit, in examining whether the defendant had a legitimate expectation of privacy in the vehicle to challenge the search, stated that "ownership interest is only one fact to be considered and standing alone will not give defendant a reasonable expectation of privacy." *Metzger,* 778 F.2d at 1200. After recognizing that the vehicle was considered the defen-

dant's wife's "personal vehicle," the court stated that it "fail[ed] to see how defendant, absent more than an ownership interest, had a reasonable expectation of privacy in his wife's personal vehicle." *Ibid.* The court also found that the defendant could not assert an expectation of privacy in the vehicle because the vehicle had been completely demolished in an explosion. Therefore, the court held that the defendant could not contest the legality of the search of the vehicle.

Unlike *Metzger,* the defendant in this case was the driver of the car when it was searched. Moreover, the court in *Metzger* clearly did not hold that a husband can never have a legitimate expectation of privacy in his wife's vehicle. Instead, the court stated that because the defendant's only connection to the vehicle was through the registration, and because the car was completely destroyed and "reduced to little more than scrap metal," *ibid.,* the defendant was in no position to challenge the search. *Metzger* provides no authority supporting the government's argument here.

The Court finds that the defendant in this case has a legitimate expectation of privacy protected by the Fourth Amendment, and, based on the present record, he properly may assert a Fourth Amendment violation.

### III.

▮ The main question is whether the defendant's act of urinating along a dirt road at night in the wilderness (and within the boundaries of a national forest) supported a particularized and objective basis from which Ranger Hill could suspect that criminal activity was afoot. *See Terry v. Ohio,* 392 U.S. 1, 17, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (observing that a police-citizen encounter that involves even minimal restraints on personal liberty "is a

serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly"). The question is framed thus because "[t]he Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Police officers, however, may briefly stop an individual for investigation if they have a "reasonable suspicion" that the individual has committed a crime. *United States v. Palomino,* 100 F.3d 446, 449 (6th Cir.1996). "The same Fourth Amendment test applies to vehicle stops." *Houston v. Clark County Sheriff Deputy John Does 1–5,* 174 F.3d 809, 813 (6th Cir.1999). "Reasonable suspicion" is more than an ill-defined hunch; it must be based upon "a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *see Houston,* 174 F.3d at 813. It requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. *Terry,* 392 U.S. at 21, 88 S.Ct. 1868; *United States v. Erwin,* 155 F.3d 818, 822 (6th Cir.1998), *cert. denied,* 525 U.S. 1123, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999). "The standard outlined in *Terry* and its progeny is not onerous." *Houston,* 174 F.3d at 813. The requisite level of suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *McPherson v. Kelsey,* 125 F.3d 989, 993 (6th Cir.1997), *cert. denied,* 523 U.S. 1050, 118 S.Ct. 1370, 140 L.Ed.2d 518 (1998). "Moreover, reasonable suspicion can arise from evidence that is less reliable than what might be required to show prob-

able cause." *Houston,* 174 F.3d at 813 (citing *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)); *McPherson,* 125 F.3d at 993.

 The government contends that Ranger Hill actually observed a violation of the law since "public urination" constitutes an offense under Michigan Compiled Laws Section 750.167(1)(f), and the defendant's act of relieving himself also triggered suspicion that he was intoxicated. The statute upon which the government relies states:

(1) A person is a disorderly person if the person is any of the following:

. . . . .

(f) A person who is engaged in indecent or obscene conduct in a public place.

Mich. Comp. Laws § 750.167(1)(f). This legislation proscribes *public* indecency, a concept generally associated with conduct consisting of exposing private body parts when one reasonably might expect that they would be viewed unwantedly by others. *In re Certified Question,* 420 Mich. 51, 63, 359 N.W.2d 513, 518 (1984) (Boyle, J., concurring) (construing the indecent exposure statute, Mich. Comp. Laws § 750.335a, to prohibit "open" exposure of the human anatomy, a "standard [that] would require evaluation of the setting in which the exposure took place in order to determine whether anyone might reasonably have been expected to observe it and, if so, whether the person might reasonably have been expected to have been offended by what was seen"); *People v. Williams,* 256 Mich.App. 576, 583, 664 N.W.2d 811, 815 (2003) (construing the same statute and concluding "that the Legislature's aim was to punish exposures that would be offensive to *viewers,* actual or potential, and not to the person exposed"). Certainly public urination in an urban setting would fall within the scope of Michigan's

disorderly person statute, quoted above. Urinating in the wilderness presents an entirely different matter. The testimony shows that the defendant, ten miles from home, stopped along a dirt road in a national forest, in the dark of night, miles from buildings and encampments, to relieve himself. He had no reason to believe that his conduct would result in exposing himself to others since no one else was apparently in the area, or that his actions would be offensive or "disorderly." The act of relieving one's bladder in the woods is not uncommon in northern Michigan, and, ironically, it was repeated a short time later by the defendant's passenger with the assistance of Ranger Hill herself. The defendant's conduct did not violate Section 750.167(1)(f).

 Nor does the act of urinating in the circumstances presented by the evidence support the suspicion that the defendant had violated the laws prohibiting drunken driving. Whether a law enforcement officer's suspicion was "reasonable" must be evaluated by reviewing the totality of the circumstances, avoiding viewing separate factors in isolation. *Arvizu,* 534 U.S. 266, 273–74, 122 S.Ct. 744. "[A]n officer's reliance on a mere 'hunch' is insufficient to justify a stop." *Id.* at 274, 122 S.Ct. 744 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868). The facts known to Ranger Hill, viewed in their entirety, do not amount to a particularized, objective basis to justify the interference with the defendant's liberty. Hill found nothing unusual in the defendant's driving. She acknowledged that he operated his vehicle at a normal speed and remarked that she would not have noticed him had he not stopped to relieve himself. The defendant merely had stopped his car on an empty road in what appeared to be the privacy of the forest.

Hill testified that she observed the defendant's brake lights flash on and off from a mile away, suggesting to her that the vehicle had parked along the road. Given Hill's mission of ferreting out poachers, it was reasonable for her to approach the vehicle from the rear to investigate further. However, once she came within fifteen to twenty yards and saw no use of a spotlight to "shine" deer, but rather, according to her testimony, observed the defendant's urine stream, any reasonable suspicion of poaching should have been dispelled.

The Court finds, therefore, that Ranger Hill lacked "a particularized and objective basis for suspecting the [the defendant] of criminal activity." *Cortez,* 449 U.S. at 417–18, 101 S.Ct. 690. Consequently, the stop of the defendant and his vehicle was unreasonable and violated the Fourth Amendment.

## IV.

The stop of the defendant in this case was not supported by reasonable suspicion. The developments thereafter, including the ensuing vehicle search and chemical tests of the defendant, were tainted by the Fourth Amendment violation. *See United States v. Richardson,* 949 F.2d 851, 858–59 (6th Cir.1991) (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). The evidence discovered thereby, therefore, must be suppressed.

Accordingly, it is **ORDERED** that the defendant's motion to suppress evidence [dkt # 8] is **GRANTED.**

It is further **ORDERED** that the plea cut-off date and final pretrial conference is scheduled for **Thursday, May 13, 2004** at **1:30 p.m.** The Court will consider the requirement for the plea cut-off to be fulfilled by the signing of the Rule 11 Agreement on or before **May 13, 2004.**

It is further **ORDERED** that a criminal jury trial in the above-captioned matter will begin on **Tuesday, June 1, 2004 at 8:30 a.m.**