RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0051p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

THOMAS LEONARD,
            *Plaintiff-Appellant,*

            *v.*

                                                            No. 05-1728

STEPHEN ROBINSON, in his individual capacity,
            *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-72199—Gerald E. Rosen, District Judge.

Argued: June 2, 2006

Decided and Filed: February 2, 2007

Before: BOGGS, Chief Judge; and KEITH and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael E. Freifeld, LAW OFFICE OF GLEN N. LENHOFF, Flint, Michigan, for Appellant. Frank A. Misuraca, KAUFMAN & PAYTON, Farmington Hills, Michigan, for Appellee. **ON BRIEF:** Michael E. Freifeld, LAW OFFICE OF GLEN N. LENHOFF, Flint, Michigan, for Appellant. Frank A. Misuraca, KAUFMAN & PAYTON, Farmington Hills, Michigan, for Appellee.

    BOGGS, C. J., delivered the opinion of the court, in which KEITH, J., joined. SUTTON, J. (pp. 13-17), delivered a separate opinion concurring in part and dissenting in part.

_____

## OPINION

_____

    BOGGS, Chief Judge. Thomas Leonard appeals the judgment of the district court granting summary judgment to the defendant, Stephen Robinson, in this civil rights action resulting from Leonard's arrest at a township board meeting. The district court dismissed the case, holding that Robinson was entitled to qualified immunity on claims for wrongful arrest and that Leonard could not make out a prima facie case on his claim for First Amendment retaliation in violation of his civil rights. We reverse both holdings. The district court's application of state law to Leonard's conduct overlooked the First Amendment and its evaluation of Leonard's retaliation claim ignored evidence indicating that Robinson did have an improper motive. We hold that 1) no reasonable officer would have found probable cause to arrest Leonard solely for uttering "God damn" while addressing the township board because the First Amendment protects this sort of uninhibited debate, and

1

2) Leonard's retaliation claim survives summary judgment because Robinson's motive for the arrest is a genuine issue of material fact in dispute.

## I

This case presents the question of whether an arrest for obscenity, vulgarity, or disturbing the peace, when based upon speech and not conduct, is valid when it occurs during a democratic assembly where there is no evidence that the individual arrested was out of order and some evidence of improper motive by the arresting officer. With due regard to the procedural disposition of the case, the facts are here recounted in the light most favorable to Leonard.

Leonard's wife Sarah operates a towing company called Leonard's Auto Works. Auto Works was the exclusive towing company for the township of Montrose, Michigan until around 2000. At that time, the Montrose Township Chief of Police, Charles Abraham, was promoting his own plan with the city board to extend township police jurisdiction to include the city of Montrose as well as the surrounding township. Agnes Johnson, Sarah Leonard's mother, was a member of the City Council and opposed Abraham's plan. Abraham asked Sarah to lobby her mother in support of the plan. In return, he offered, Auto Works could continue to tow for the Township. When Sarah refused, Auto Works lost its business with the Township. Sarah sued the Township and Chief Abraham in Genesee County Circuit Court under 42 U.S.C. § 1983 for violating her First Amendment rights. The case was removed to federal court and settled in February 2003. *Leonard v. Montrose*, No. 02-71084 (E.D. Mich. Feb. 11, 2003) (stipulation dismissing case). As a result of the lawsuit, according to Leonard, Chief Abraham hated him and his wife.

Before the settlement, on October 15, 2002, Thomas, Sarah, and their child attended a Township Board meeting. Officer Robinson testified that he was ordered by Chief Abraham to attend the meeting. Thomas Leonard believes that Abraham ordered Robinson to attend so that he might arrest Sarah in retaliation for her suit against him. Much of the meeting was recorded on videotape. When he arrived, Robinson took his seat at the back of the meeting hall because he "do[esn't] really like anyone behind [him]." Near the beginning of the meeting, Robinson was asked by another attendee why he, a police officer, was present. Robinson lied in response—he did not disclose that the Chief had ordered him to attend. Instead, he said, "I'd like to see what's going on."

Later in the meeting, during the portion known as Citizen Time, Sarah addressed the council about the actions the Township had taken that had affected her business: Auto Works was not selected for several police car repair contracts, even though it was the low bidder, and Auto Works was no longer called to tow wrecked municipal vehicles. When she finished, Thomas Leonard was recognized by the Township Supervisor, Don Papineau. Thomas arose and spoke:

| | |
|---|---|
| **LEONARD**: | It's not right and you guys know it. We want an answer. We're sick and tired of getting screwed. You guys are screwing us and we know it. We're sitting, the attorneys are sitting here, he hasn't read about it, nobody knows nothing about it. I'm sick of it. |
| **PAPINEAU**: | I, I disagree that we screwed Leonard's [Auto Works] or— |
| **LEONARD**: | You do? Do it right now. |
| **PAPINEAU**: | Yes, sir, I do. |
| **LEONARD**: | (inaudible) |
| **PAPINEAU**: | I disagree with that. |
| **LEONARD**: | Well, that's good. That's why you're in a God damn lawsuit— |

Thomas then sat down. After he had taken his seat, Papineau said, "Hey, do not use the Lord's name in vain." Leonard responded, "I'll do whatever I want, Don, just like you." At that point, Officer Robinson entered the conversation:

| | |
|---|---|
| **ROBINSON**: | (inaudible) |
| **LEONARD**: | You stay out of it. I'm not talking to you. |
| **ROBINSON**: | (inaudible) |
| **LEONARD**: | No, you come in here, you come here— |
| **ROBINSON**: | No, I come here as a police officer. |
| **LEONARD**: | No, you didn't. Don't give me a hard time. |
| **ROBINSON**: | If I'm going to (inaudible) I'm going to take you with me. |
| **LEONARD**: | I'm ready to go, so, let's go. |

Robinson took Leonard outside the meeting room and placed him under arrest. Leonard was transported to the police station and charged with violations of Michigan Compiled Laws §§ 750.167 (disorderly person) and 750.337 (obscenity). He was released after a one-hour detention. One month later the citation was voided and dismissed.

On June 6, 2003, Leonard filed this action against Robinson in his personal capacity in the United States District Court for the Eastern District of Michigan, alleging that Robinson, under color of law, violated his Fourth Amendment right to be free of unreasonable seizure. The complain also raised three state law torts: battery, false arrest, and false imprisonment. Robinson filed a motion for summary judgment on November 20, 2003. He argued that he was entitled to qualified immunity on the constitutional allegations and that the state law claims must be dismissed because the arrest was supported by probable cause. To bolster this claim, Robinson cited two additional Michigan statutes that Leonard may have violated, Michigan Compiled Laws §§ 750.103 (cursing and swearing) and 750.170 (disturbance of lawful meetings). Leonard filed a response to the motion, defending his claims under a First Amendment retaliation theory and generally asserting the same grounds he does here on appeal.

On May 4, 2005, the district court granted the motion for summary judgment and dismissed the case. *Leonard v. Robinson*, No. 03-72199, slip op. at 26 (E.D. Mich.) [hereinafter D. Ct. Op.]. The district court held that Robinson did not violate the Fourth Amendment because he had probable cause to arrest Leonard. *Id.* at 7. The court declined to exercise supplemental jurisdiction over the state law claims. D. Ct. Op. at 27 n.17. The court found that even though Michigan Compiled Laws § 750.337 (criminalizing indecent language in the presence of women or children) had been invalidated by the Michigan Supreme Court, other statutes, criminalizing conduct for which Leonard had not been charged, supported the arrest, *viz.*, §§ 750.103 (swearing), 750.170 (disturbing a meeting), and 750.167 (disorderly person). Therefore, based upon these statutes, Robinson had probable cause to arrest Leonard because he had violated the plain language of those statutes and Robinson was "to enforce laws until and unless they are declared unconstitutional." D. Ct. Op. at 12. *See also Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (holding that an officer's subjective reason for making an arrest need not include the criminal offense that later establishes probable cause).

The district court denied Leonard's First Amendment retaliation claim by holding that there was no "causal connection between Plaintiff's protected speech and his arrest." D. Ct. Op. at 25. The court held that our precedents "recognize[] a permissible inference of retaliatory motive in only a particular category of cases: namely, those cases where all of the possible grounds for arrest arise solely during the course of a citizen's encounter with a police officer." *Id.* at 23 (citing *McCurdy v. Montgomery County*, 240 F.3d 512 (6th Cir. 2001) and *Greene v. Barber*, 310 F.3d 889 (6th Cir. 2002)). The court refused to make reasonable inferences favorable to Leonard's claims. Instead, it ignored his allegations regarding Robinson's motive for the arrest, the previous lawsuit by

Leonard's wife, and Robinson's inconsistent statements and held that "there is absolutely no evidence of any improper motive." D. Ct. Op. at 22. The district court concluded that it was illegal to "use[] objectionable language and become[] somewhat belligerent during a public meeting," *id.* at 27, and that Leonard should have just calmed down and not made a federal case of it.

## II

We review a grant of summary judgment on qualified immunity grounds de novo "because application of this doctrine is a question of law." *McCloud v. Testa*, 227 F.3d 424, 428 (6th Cir. 2000) (internal quotation and citations omitted). *See also Armstrong v. City of Melvindale*, 432 F.3d 695, 698 (6th Cir. 2006). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The district court, and this [c]ourt in its review of the district court, must view the facts and any inferences reasonably drawn from them in the light most favorable to the party against whom judgment was entered." *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co., Inc.*, 395 F.3d 338, 342 (6th Cir. 2005) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The party opposing summary judgment cannot rest on its pleading or allegations, to prevail, they must present material evidence in support of their allegations. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III

### A

"Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) (citing *Ker v. California*, 374 U.S. 23 (1963) and *Johnson v. United States*, 333 U.S. 10 (1948)). As we shall discuss, the laws cited by Robinson, in support of the contested arrest, are all state laws. Both parties agree that "[w]here probable cause exists, '[a] police officer is permitted to make an arrest without a warrant for a misdemeanor committed in his presence.'" *United States v. Reed*, 220 F.3d 476, 478 (6th Cir. 2000) (quoting *United States v. Smith*, 73 F.3d 1414, 1416 (6th Cir.1996)).

We must independently and objectively determine whether Robinson had probable cause to arrest Leonard.

> Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. . . . "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent." "[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer."

*Devenpeck*, 543 U.S. at 152–53 (citations omitted). "[P]robable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999) (citing *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

Robinson has asserted the defense of qualified immunity. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Estate of Carter v. Detroit*, 408 F.3d 305, 310–11 (6th Cir. 2005)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The initial inquiry in ascertaining the validity of a qualified immunity defense is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  *See also Silberstein v. Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). "In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established."  *Saucier*, 533 U.S. at 194.  If the court can find, "on a favorable view of the [plaintiff's] submissions," a violation of a constitution right, the next step in *Saucier*'s sequential analysis is to determine if the right was clearly established.  *Ibid.  See also Groh v. Ramirez*, 540 U.S. 551, 563–64 (2004) (noting that reasonable public officials should know the law governing their conduct).  For a right to be clearly established, the "'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Greene v. Barber*, 310 F.3d 889, 893 (6th Cir. 2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

We will not grant immunity to a defendant if no reasonably competent peace officer would have found probable cause.  *See Malley v. Briggs*, 475 U.S. 335, 341 (1986).  In other words, "[i]t is clearly established that arrest without probable cause violates the Fourth Amendment."  *Klein v. Long*, 275 F.3d 544, 550 (2001) (quoting *Donovan v. Thames*, 105 F.3d 291, 297–98 (6th Cir. 1997)).  Where the reasonableness of an officer's actions hinge on disputed issues of fact, "the jury becomes the final arbiter of . . . immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury."  *Brandenburg v. Cureton*, 882 F.2d 211, 215–16 (6th Cir. 1989).

"[G]overnment officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity." *Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir. 1998) (quoting *Duran v. Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990)).  For a plaintiff to state a claim for First Amendment retaliation, he must show that the injury was material, *Bloch*, 156 F.3d at 678 (that the injury would "would likely chill a person of ordinary firmness from continuing to engage in that activity"), "that his conduct was constitutionally protected," and that it was a "motivating factor" behind the government's actions. *Adair v. Charter County of Wayne*, 452 F.3d 482, 492 (6th Cir. 2006); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  A "motivating factor" is essentially but-for cause—"without which the action being challenged simply would not have been taken."  *Greene*, 310 F.3d at 897.

Probable cause is clearly relevant to Leonard's First Amendment retaliation claims.  *See Hartman v. Moore*, 126 S. Ct. 1695, 1699 (2006).  In *Hartman*, the Supreme Court determined that probable cause is an element of a malicious prosecution charge brought as constitutional tort under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U. S. 388 (1971).  *Hartman*, 126 S. Ct. at 1699.  Although there are differences between wrongful arrest and malicious prosecution, *see id.* at 1705 (noting that "the causal connection required here is not merely between the retaliatory animus of one person and that person's own injurious action, but between the retaliatory animus of one person and the action of another"), there is an obvious similarity in that "the significance of probable cause or the lack of it looms large," *id.* at 1706.  *Hartman*, therefore, calls into question our cases holding that "probable cause is not determinative of the [First Amendment] constitutional question."  *See Greene*, 310 F.3d at 895.  Yet, we need not decide whether *Hartman* adds another element to every First Amendment claim brought pursuant to § 1983 because, when viewed in the light most favorable to the plaintiff, we find that the facts of this case demonstrate an absence of probable cause.

In sum then, both Leonard's claims[1] and Robinson's defenses turn on the laws that Leonard allegedly violated and their validity as applied in the context of a democratic assembly. Again, when the facts are viewed in a light most favorable to Leonard, we believe that First Amendment freedoms, clearly established for a generation, preclude a finding of probable cause because the laws cited by Robinson are either facially invalid, vague, or overbroad when applied to speech (as opposed to conduct) at a democratic assembly where the speaker is not out of order.

B

Robinson relies on four sections of Michigan's Penal Code defining various misdemeanors. Leonard was charged with two violations of Michigan Law. The first is Michigan Compiled Laws § 750.167, defining a disorderly person:

> (1) A person is a disorderly person if the person is any of the following:
>> (a) A person of sufficient ability who refuses or neglects to support his or her family. (b) A common prostitute. (c) A window peeper. (d) A person who engages in an illegal occupation or business. (e) A person who is intoxicated in a public place and who is either endangering directly the safety of another person or of property or is acting in a manner that causes a public disturbance. *(f) A person who is engaged in indecent or obscene conduct in a public place.* (g) A vagrant. (h) A person found begging in a public place. (i) A person found loitering in a house of ill fame or prostitution or place where prostitution or lewdness is practiced, encouraged, or allowed.
>> * * *

*Ibid.* (emphasis added). *See also* Mich. Comp. Laws § 750.168 (stating that it is a misdemeanor to be a disorderly person). In Robinson's deposition, he reveals that he believes subsection (f) to be most applicable to Leonard's conduct at the meeting. The criminal citation also relied upon Michigan Compiled Laws § 750.337:

> INDECENT, ETC., LANGUAGE IN PRESENCE OF WOMEN OR CHILDREN—Any person who shall use any indecent, immoral, obscene, vulgar or insulting language in the presence or hearing of any woman or child shall be guilty of a misdemeanor.

*Ibid.*, *invalidated by People v. Boomer*, 655 N.W.2d 255 (Mich. Ct. App. 2002).

Additionally, to support his defenses of qualified immunity and probable cause, Robinson presented two more statutes in his motion for summary judgment. *See* Br. of Appellee at 10–12. The first of these, Michigan Compiled Laws § 750.103 states:

> CURSING AND SWEARING—Any person who has arrived at the age of discretion, who shall profanely curse or damn or swear by the name of God, Jesus Christ or the Holy Ghost, shall be guilty of a misdemeanor. No such prosecution shall be sustained unless it shall be commenced within 5 days after the commission of such offense.

*Ibid.* The next and last law, Michigan Compiled Laws § 750.170, states:

---

[1] "To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006).

DISTURBANCE OF LAWFUL MEETINGS—Any person who shall make or excite any disturbance or contention in any tavern, store or grocery, manufacturing establishment or any other business place or in any street, lane, alley, highway, public building, grounds or park, or at any election or other public meeting where citizens are peaceably and lawfully assembled, shall be guilty of a misdemeanor.

*Ibid.*

C

The First Amendment is an important part of our system of self-government. It specifically allows for the people "to petition the government for a redress of grievances." U.S. Const. amend. I. The limitations of the First Amendment are applicable to the states. *See Near v. Minnesota*, 283 U.S. 697, 707 (1931) ("It is no longer open to doubt that the liberty of the press and of speech is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action.").

Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes.

*Mills v. Alabama*, 384 U.S. 214, 218–19 (1966); *Stromberg v. California*, 283 U.S. 359, 369 (1931) ("The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system"). The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (citing *Terminiello v. Chicago*, 337 U.S. 1 (1949) and *De Jonge v. Oregon*, 299 U.S. 353 (1937)). Even those who advocate the most narrow interpretation of the freedom of speech agree that in a democratic forum like a township meeting, the state should abstain from regulating speech:

Constitutional protection should be accorded only to speech that is explicitly [sic] political. There is no basis for judicial intervention to protect any other form of expression, be it scientific, literary or that variety of expression we call obscene or pornographic. Moreover, within that category of speech we ordinarily call political, there should be no constitutional obstruction to laws making criminal any speech that advocates forcible overthrow of the government or the violation of any law.

Robert H. Bork, *Neutral Principles and Some First Amendment Problems*, 47 Ind. L.J. 1, 20 (1971).

Of course, the constitutional protection of speech is not without limits. Specifically not afforded protection are fighting words, "those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Barnes v. Wright*, 449 F.3d 709, 717 (6th Cir. 2006) (internal quotations and citations omitted).

The First Amendment permits "restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'"

> Thus, for example . . . fighting words—"those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction"—are generally proscribable under the First Amendment.

*Virginia v. Black*, 538 U.S. 343, 358–59 (2003) (citations omitted) (holding that the First Amendment permits Virginia to outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation and speech or symbolic acts to intimidate lack First Amendment protection).

D

Section 750.337 of Michigan Compiled Laws, regulating speech in the presence of women or children, was held unconstitutional by the Court of Appeals of Michigan in *Boomer*, 655 N.W.2d 255. *Boomer* reversed the conviction of a criminal defendant prosecuted under the law. The man, known to the local media as the cussing canoeist, was convicted for uttering a string of expletives in the presence of women and children upon tipping his canoe on the Rifle River. *Id*. at 256. *See also* Sarah Kershaw, *A 1909 Washington State Law Shielding a Woman's Virtue Is Being Challenged*, N.Y. Times, Jan. 26, 2005 at A13. The court determined that it was "unnecessary to address [Boomer's] overbreadth arguments, or to undertake an extensive First Amendment analysis, because . . . M.C.L. § 750.337 is unconstitutionally vague." 655 N.W.2d at 257. The court explained that "in order to pass constitutional muster, a penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Id*. at 258 (internal quotations and citations omitted).

> A vague law impermissibly *delegates basic policy matters to policemen*, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. . . . Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.
>
> Here, it would be difficult to conceive of a statute that would be more vague than M.C.L. § 750.337. There is no restrictive language whatsoever contained in the statute that would limit or guide a prosecution for indecent, immoral, obscene, vulgar, or insulting language. Allowing a prosecution where one utters "insulting" language could possibly subject a vast percentage of the populace to a misdemeanor conviction.

*Id.* at 258–59 (emphasis added) (citations, internal quotations, and omissions removed).

The court went on to state that, "[the statute], as currently drafted, impinges on First Amendment freedoms. . . . [It is] unquestionable that [the statute], as drafted, reaches constitutionally protected speech, and it operates to inhibit the exercise of First Amendment rights." *Id*. at 259. Thus, it is clear that probable cause for Leonard's arrest is not supported by § 750.337. *See Sandul v. Larion*, 119 F.3d 1250, 1256 (6th Cir. 1997) (holding that protected speech cannot serve as the basis for a violation of city ordinances at issue).

Michigan's courts have not commented so clearly and directly upon the constitutionality of the other three statutes at issue in this case. Surely aware of this fact, Robinson argues that *Boomer* says nothing about the other statutes' validity because it is well established that:

> Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement

officers concerning its constitutionality-with the possible exception of a law so grossly and *flagrantly unconstitutional* that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.

*DeFillippo*, 443 U.S. at 38 (emphasis added); *accord Boomer*, 655 N.W.2d at 257. The Michigan Supreme Court held that the law in *Boomer* was just such a law—that it was "difficult to conceive of a statute that would be more vague than M.C.L. § 750.337." 655 N.W.2d at 258. *See also Sandul*, 119 F.3d at 1257 (Kennedy, J., dissenting) (arguing that *DeFillippo* is strengthened in "the absence of any Michigan case law which has held a similar ordinance unconstitutional."). Similarly, viewing the facts in the light most favorable to the plaintiff, no reasonable police officer would believe that any of the three other Michigan statutes relied upon by the district court are constitutional as applied to Leonard's political speech during a democratic assembly.

Therefore, and for many of the same reasons relied upon by the *Boomer* court, we hold that Michigan Compiled Laws § 750.167(f), to the extent it is applied to Leonard's speech, cannot here support probable cause. First, the plain language of that statute regulates conduct and not speech. We understand indecent or obscene as regulated in § 750.167(f) as regulating "conduct consisting of exposing private body parts when one reasonably might expect that they would be viewed unwantedly by others," *United States v. Whitmore*, 314 F. Supp. 2d 690, 698 (E.D. Mich. 2004), and not speech. Furthermore, to the extent that § 750.167(f) is intended to regulate speech, we hold that its language is so free of limitation and so closely tracks that of § 750.337 that it is flagrantly unconstitutional.

Next, we hold that Leonard's conduct could not have been proscribed by Michigan Compiled Laws § 750.103. That law makes "profanely curs[ing] or damn[ing] or swear[ing] by the name of God, Jesus Christ or the Holy Ghost" a crime. *Ibid.* The Supreme Court has held that a state may not make a "single four-letter expletive a criminal offense." *Cohen v. California*, 403 U.S. 15, 26 (1971). In *Cohen*, "the defendant was observed in the Los Angeles County Courthouse . . . wearing a jacket bearing the words 'Fuck the Draft.'" *Id.* at 16. "The defendant [in *Cohen*] testified that he wore the jacket knowing that the words were on the jacket as a means of informing the public of the depth of his feelings against the Vietnam War and the draft." *Ibid.* We can find no principled distinction between the expletive in *Cohen* and the milder profanity in this case. Although "the right of free speech is not absolute at all times and under all circumstances," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942), Leonard's utterance of "God damn," was not, as a matter of law "likely to cause a fight." *Id.* at 573. *Accord Sandidge v. State*, 630 S.E.2d 585, 586 (Ga. Ct. App. 2006) (holding that "arrest me" and "damn" were not fighting words and listing other Georgia cases that did involve fighting words under *Chaplinsky*); *Sandul*, 119 F.3d at 1255 (citing *Chaplinsky*, and relying on *Cohen* for the holding that the use of the word "fuck," in and of itself, is not criminal conduct). Prohibiting Leonard from coupling an expletive to his political speech is clearly unconstitutional. *See Miller v. California*, 413 U.S. 15, 24 (1973) (conduct may be obscene when, taken as a whole, it lacks serious political value). Section 750.103, if not facially invalid, is radically limited by the First Amendment.

Finally, we consider Michigan Compiled Laws. § 750.170, prohibiting "[a]ny person who shall make or excite any disturbance or contention . . . at any . . . public meeting where citizens are peaceably and lawfully assembled." Although this section may constitutionally proscribe some conduct, it has already been held to be overbroad by a Michigan court. We agree.

A sit-in at the University of Michigan's Literature, Science, and Arts building was the subject of *People v. Mash*, 206 N.W.2d 767, 768 (Mich. Ct. App. 1973). The defendant in that case challenged that § 750.170 was void for vagueness and overbreadth. *Ibid.* The *Mash* court

recognized that the words "excite any contention" must be excised from the statute for it to survive constitutional scrutiny, for without this alteration, the statute might unconstitutionally criminalize the expression of ideas, "'merely because the ideas are themselves offensive to some of their hearers.'" *See Bachellar v. Maryland*, 397 U.S. 564, 571 (1970) (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)).  An earlier decision by the Court of Appeals of Michigan had suggested:

> In all prosecutions under this statute the activity to be punished must be shown to present clear and present danger of riot, disorder, interference with traffic, or a threat to public safety.  The statute is concerned with intentional acts of violence or threats of the commission of acts of violence by persons having the ability of immediate execution of such threats.

*People v. Purifoy*, 191 N.W.2d 63, 64 (Mich. Ct. App. 1971).  The *Mash* court refused to adopt these limiting principles.  While *Mash* is somewhat unclear about what expressive conduct may be proscribed by the state, when we view the facts here in a light most favorable to Leonard, there is no conduct at issue for the statute to prohibit, nor is there conduct upon which Robinson could find probable cause.

Application of *Mash* to these facts is, in the first instance, a job for the district court.  For our purposes, we consider Leonard's version of the incident and "view the facts and any inferences reasonably drawn from them in the light most favorable to [him.]"  *Kalamazoo Acquisitions*, 395 F.3d at 342.  On this view, there was no disturbance to which a court might apply § 750.170 and no reasonable police officer could think so.  The exact nature of Leonard's conduct is instead a disputed issue of material fact, and our legal analysis need not consider the merits of that dispute.  *See Cureton*, 882 F.2d at 215–16.  On one view of the facts, Leonard was merely advocating an idea.  This cannot support a conviction and it cannot create probable cause.  *Bachellar*, 397 U.S. at 570.  "It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."  *Street*, 394 U.S. at 592; *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (noting "an 'equality of status in the field of ideas'").  *See also, e.g., Brown v. Louisiana*, 383 U.S. 131, 150 (1966) (reversing a breach of the peace conviction for staging a protest at a segregated library); *Shuttlesworth v. City of Birmingham*, 382 U.S. 87 (1965) (reversing a loitering conviction in connection with a civil rights protest); *Edwards v. South Carolina*, 372 U.S. 229 (1963) (reversing breach of the peace convictions for protest against segregation on the capitol grounds).  *But see Feiner v. New York*, 340 U.S. 315, 320 (1951) (upholding conviction for breach of the peace where sidewalk speaker created an "immediate threat to public safety, peace, or order.")

The crux of this case perhaps lies in the dissent's statement that certain facts are "undisputed because the record contains a video of the incident."  The dissent's characterization of the events shown on the tape, as rendered at page 14, is perhaps reasonable.  However, that characterization is neither undisputed, nor undisputable.  This judge has looked at the same tape, and not only come to a slightly different conclusion personally, but more importantly concluded that a rational juror could come to a different conclusion.  This judgment means that there is a genuine issue of material fact as to whether Leonard's conduct could constitutionally be considered criminal by any rational officer.

We conclude that the statute is unconstitutional as applied by the district court because the procedural posture of the case permits a finding that Leonard merely advocated an idea.  This conclusion is based upon First Amendment jurisprudence that is decades old.  In light of this, and of the prominent position that free political speech has in our jurisprudence and in our society, it cannot be seriously contended that any reasonable peace officer, or citizen, for that matter, would believe that mild profanity while peacefully advocating a political position could constitute a criminal act.  The facts in this case could lead a reasonable factfinder to conclude that the

circumstance of Leonard's arrest for disturbing the peace were devoid of any indicia of disruption or contention.  *See* Mich. Comp. Laws. § 750.170.

We therefore hold that no reasonable officer would find that probable cause exists to arrest a recognized speaker at a chaired public assembly based solely on the content of his speech (albeit vigorous or blasphemous) unless and until the speaker is determined to be out of order by the individual chairing the assembly.  *See Jones v. Heyman*, 888 F.2d 1328, 1329 (11th Cir. 1989) (holding that the chair of city commission meeting may, without violating the First Amendment, have a speaker removed when she becomes disorderly by speaking off-topic).  Any peace officer in attendance can reasonably be expected to restrain herself from arresting speakers based upon what they say while advocating their political positions in an orderly fashion.  *See Houston v. Hill*, 482 U.S. 451, 461–62 (1987) (noting that a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen).  Therefore, because Leonard's arrest was not supported by probable cause, it was error for the district court to grant Robinson qualified immunity on the Fourth Amendment claims.

E

The district court's analysis of the retaliation claim under *Mt. Healthy* was also flawed. Because Leonard's conduct was constitutionally protected and because arrest is particularly suited to chill this conduct, *see Bloch*, 156 F.3d at 679–80 (holding that a combination of embarrassment, humiliation, and emotional distress is sufficient to chill for *Mt. Healthy's* purposes), we focus on the district court's evaluation of Robinson's motive for the arrest.  The district court never considered whether Leonard's exchange with the board was protected speech.  It accepted without analysis that the Michigan statutes were valid as applied because no court decision had specifically struck them down *in toto*.  The court then concluded that Michigan had validly proscribed Leonard's conduct before the Board and that probable cause existed for an arrest.

The district court did not address evidence that was relevant to Robinson's motivation in making the arrest.  The court noted, that at the moment of arrest:

> Plaintiff already had commenced his vehement complaints that the township board had been "screwing over" his family's business, and he already had made the reference to a "goddamn lawsuit" which, as discussed earlier, provided probable cause to arrest for violating Mich. Comp. Laws § 750.103.  Moreover, all of these statements were directed at the township supervisor, and not at Defendant. Consequently, when Defendant initially approached Plaintiff and asked him to calm down, there would have been absolutely no reason to suspect that Defendant's "true motivation was to punish a slight to his dignity."  Rather, Defendant presumably *could only have been acting* out of an appropriate desire to preserve calm and order at a public meeting, or perhaps with the intention to act upon Plaintiff's apparent violation of a Michigan statute.  At a minimum, there is absolutely no evidence of any improper motive or purpose that might have led Defendant to initiate the encounter with Plaintiff.

D. Ct. Op. at 21–22 (emphasis added).

Although we believe that it is a close case on this point, we reverse.  A reasonable factfinder, viewing the record evidence in the light most favorable to Leonard, could conclude that he was arrested in retaliation for constitutionally protected conduct.  Leonard's deposition reveals disputed facts about a prior lawsuit (several lawsuits, according to counsel at oral argument), a feud between the police department and his family, and Chief Abraham's "hatred" of his wife.  The recording of the Township meeting, with Leonard off-camera and recorded only in voice, also creates a triable

issue on whether Leonard disrupted the meeting and whether Robinson lied about his motive to attend.

We cannot ignore that Leonard's testimony on one point is equivocal. In response to the question, "Do you have any—aside from your opinion that's happened, do you have any facts or any statements from people to support your opinion [that Robinson was ordered to arrest one of the Leonards]?" Leonard answered, "No." This answer is inconsistent with Leonard's prior statements in the same deposition where he details the circumstances surrounding his wife's prior lawsuit with Chief Abraham. In light of this, his answer can be interpreted as a response to a misunderstood question because it is not unreasonable to infer that the related facts about the political situation in Montrose support Leonard's opinion. We interpret Leonard's "no" answer to mean that he was unaware of any direct admissions from the defendant or Chief Abraham that would definitively prove his case. It is not Leonard's burden to depose every individual whose testimony might add credibility to his allegations in order to oppose Robinson's motion for summary judgment. These are difficult cases to try, *see Hartman*, 126 S. Ct. at 1705, but the facts and circumstances surrounding Leonard's arrest are sufficiently odious to support a reasonable inference of retaliatory conduct. Robinson could have eliminated these suspicions by deposing Leonard's wife and mother-in-law, whose testimony would tend to either enhance or detract from the veracity of Leonard's allegations. In fact, Leonard's final witness list prepared for the district court names Sarah Leonard, and his mother-in-law, Agnes Johnson, as individuals who may testify for the plaintiff.

We hold that Leonard has set out a prima facie case of First Amendment retaliation and has created a genuine issue of material fact. *See* Fed. R. Civ. P. 56. A jury could reasonably find that Robinson acted out of malice in arresting Leonard. *See Musso v. Hourigan*, 836 F.2d 736, 742 (2d Cir. 1988) (affirming the district court's denial of qualified immunity on First Amendment retaliation allegations of false arrest at an open school board meeting).

## IV

For the reasons stated above, we **REVERSE** the district court's entry of summary judgment and **REMAND** for further proceedings consistent with this opinion.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. Officer Robinson had probable cause to arrest Leonard for violating any one of four Michigan statutes: Michigan Compiled Laws § 750.103 ("Cursing and swearing"); § 750.167 ("Disorderly person"); § 750.170 ("Disturbance of lawful meetings"); and § 750.337 ("Women or children, improper language in presence"). While I am prepared to accept the majority's judgment that the application of all four statutes to Leonard violated his First Amendment rights, I am not prepared to accept its judgment that the Supreme Court, our court or the Michigan courts had clearly established the unconstitutionality of all four of these duly enacted laws before this incident.

The Michigan courts, it is true, had declared one of the four statutes facially unconstitutional six-and-a-half months before this arrest. *See* Mich. Comp. Laws § 750.337 (criminalizing the "use [of] any indecent, immoral, obscene, vulgar or insulting language in the presence or hearing of any woman or child"), *invalidated by People v. Boomer*, 655 N.W.2d 255, 259 (Mich. Ct. App. 2002) (holding § 750.337 "facially vague"). But the other three have been on the books since 1931, *see* Mich. Pub. Act No. 328, §§ 103, 167, 170 (Sept. 18, 1931), were enacted by a state legislature sworn to uphold the United States Constitution, *see* U.S. Const. art. VI, cl. 3, and accordingly receive a presumption of constitutionality, *Illinois v. Krull*, 480 U.S. 340, 351 (1987).

Put yourself in the shoes of Officer Robinson when it comes to enforcing just one of these statutes, § 750.170 ("Disturbance of lawful meetings"), on the evening of October 15, 2002. Let us assume (improbably) that Robinson had looked at the statute before attending the meeting. Let us assume (even more improbably) that Robinson had looked at judicial interpretations of the statute before the meeting. And let us assume (most improbably) that Robinson had read *Cohen v. California*, 403 U.S. 15 (1971), before the meeting.

The statute, he would have learned, says that "[a]ny person who shall make or excite any disturbance . . . at any election or other public meeting where citizens are peaceably and lawfully assembled, shall be guilty of a misdemeanor." Nothing about the case law enforcing the provision would have tipped him off that he was clearly forbidden from applying it here. One of the cases defines "disturbance" as "[a]ny act . . . contrary to the usages of a sort of meeting and class of persons assembled that interferes with its due progress or irritates the assembly in whole or in part." *People v. Weinberg*, 149 N.W.2d 248, 251 (Mich. Ct. App. 1967) (internal quotation marks omitted); *id.* at 252–53 (upholding a conviction under the law on the grounds that the defendants "hindered and interfered" with a savings and loan association's "right to conduct [its] business in an orderly, quiet, decorous manner" when they sat on the floor and were "requested to leave" but "refused to do so"). Another case upholds a conviction where the evidence showed that the defendants had "failed to leave the building when requested" and that their presence interfered with janitorial service. *People v. Mash*, 206 N.W.2d 767, 770 (Mich. Ct. App. 1973). And both of these cases *uphold* the statute in the face of constitutional challenges. *Mash*, 206 N.W.2d at 770 (holding that "§ 750.170 is not void for vagueness nor constitutionally infirm for overbreadth"); *Weinberg*, 149 N.W.2d at 255–56 (holding that § 750.170 was not "unconstitutionally broad" and upholding convictions in the face of a First Amendment challenge). As for *Cohen v. California*, it would have taught him that the First (and Fourteenth) Amendment prohibits a State from making "a single four-letter expletive a criminal offense." 403 U.S. at 26.

All Robinson would have learned, in other words, is that the statute had been enforced several times during its 75-year existence; it had not sunk into desuetude as shown by the fact that it had been enforced within the last decade, *People v. Walker*, No. 198893, 1998 WL 1989516

(Mich. Ct. App. Oct. 27, 1998); it had withstood two constitutional challenges, one of them on First Amendment grounds; and *Cohen* prevented him only from arresting someone on the sole ground that the individual had uttered an expletive. Even had Robinson been equipped with this uncommonly extensive knowledge of Michigan and federal law, indeed even had Robinson carried a laptop equipped with Westlaw and Lexis/Nexis to the meeting, I am hard pressed to understand how he would have known that it was "clearly established" that he could not enforce this law in this setting.

The undisputed facts (undisputed because the record contains a video of the incident) show that Robinson observed Leonard at a "public meeting where citizens were peaceably and lawfully assembled," Mich. Comp. Laws § 750.170, yelling, swearing and answering requests with the words "I'll do what I want." JA 152. What starts as a pointed, but seemingly controlled, exchange between Leonard and a board member turns into Leonard speaking over the board member and degenerates into Leonard losing control and simply yelling at the board member. At that stage, when Robinson stepped in, Leonard not only had created a "disturbance" at this public meeting but also had lost control of himself. One can only wonder where the verbal confrontation was heading, and it is doubtful that a single one of the 25 or so people in attendance (save the Leonards) regretted Robinson's decision to take action. A reasonable police officer could fairly believe that Leonard had "excite[d] [a] disturbance," Mich. Comp. Laws § 750.170, either by "interfer[ing]" with the council meeting's "due progress" by "refusing" to abide by the council member's requests, *Weinberg*, 149 N.W.2d at 251; *see also Mash*, 206 N.W.2d at 770, or by "hinder[ing]" the meeting from "conduct[ing] [its] business" by yelling and cursing during the meeting, *Weinberg*, 149 N.W.2d at 252.

It may be true that Robinson did not wait for the chair to call Leonard "out of order." *See* Maj. Op. at 11. But I am not aware of any requirement—under Michigan law, the First Amendment or any other law—that an officer may restore order to such a gathering only by following Robert's Rules of Order.

Nor does *People v. Purifoy*, 191 N.W.2d 63 (Mich. Ct. App. 1971), alter this conclusion. While one of the three judges reviewing that case stated that activity punished under § 750.170 must present a "clear and present danger of riot," *id.* at 65, two of the three judges in *Purifoy* expressly rejected this language, *id.* (Danhof and V.F. Brennan, JJ., concurring in part and dissenting in part) ("We cannot agree, however, that all prosecutions under the statute . . . would require that the activity to be punished must be shown to present a clear and present danger of riot . . . ."). Two years later, *Mash* removed all doubt about the point. *See* 206 N.W.2d at 770 (noting that "the other members of the [*Purifoy*] panel . . . . declined to adopt the qualifying language cited by the Chief Judge," and holding that "[w]e also respectfully decline to follow this dicta in *Purifoy*").

In *Michigan v. DeFillippo*, 443 U.S. 31 (1979), the Supreme Court addressed the problem raised by this case—namely, how can the courts fairly require police officers to anticipate constitutional rulings?—in the context of ruling on a suppression motion filed under the Fourth Amendment:

> At that time, of course, there was no controlling precedent that this ordinance was or was not constitutional, and hence the conduct observed violated a presumptively valid ordinance. A prudent officer, in the course of determining whether respondent had committed an offense under all the circumstances shown by this record, should not have been required to anticipate that a court would later hold the ordinance unconstitutional.
>
> Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so

> grossly and flagrantly unconstitutional that any person of reasonable prudence would
> be bound to see its flaws. Society would be ill-served if its police officers took it
> upon themselves to determine which laws are and which are not constitutionally
> entitled to enforcement.

*Id.* at 37–38. Similar reasoning ought to apply here. *DeFillippo*, it is true, applied what came to be known as the "*Leon* good faith" exception to the Fourth Amendment. *Id.* at 38. But "the *Leon* good-faith inquiry and the qualified-immunity inquiry are one and the 'same,'" *Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco & Firearms*, 452 F.3d 433, 448 (6th Cir. 2006) (en banc) (quoting *Groh v. Ramirez*, 540 U.S. 551, 565 n.8 (2004)); *see also United States v. Leon*, 468 U.S. 897, 911–12 (1984) ("We have not required suppression of the fruits of a search incident to an arrest made in good-faith reliance on a substantive criminal statute that subsequently is declared unconstitutional.") (citing *DeFillippo*).

To my knowledge, the Supreme Court has never rejected a claim of qualified immunity to a police officer who enforced a statute that had not been declared unconstitutional at the time of the citizen-police encounter. While *DeFillippo* acknowledges "the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws," 443 U.S. at 38, the exception remains just that—a theoretical possibility, one that can be imagined but that the Court has never enforced.

Adhering to *DeFillippo*'s guidance that the combination of legislative action and judicial inaction generally "forecloses speculation by enforcement officers concerning [a statute's] constitutionality," 443 U.S. at 38, the Sixth Circuit has resisted imposing liability on police officers and other officials who fail to anticipate each twist and turn of judicial review. *See Risbridger v. Connelly*, 275 F.3d 565, 574 (6th Cir. 2002) (granting qualified immunity to an officer who had arrested plaintiff for refusing to identify himself because "a reasonable officer would not have known that the ordinance would be found to be unconstitutionally vague as applied in this situation"); *Wolfel v. Morris*, 972 F.2d 712, 720 (6th Cir. 1992) ("[S]ince the defendants reasonably relied on and applied valid regulations, they are entitled to qualified immunity for their actions. The fact that these regulations were subsequently held unconstitutionally vague as applied in a court case addressing a fairly complex legal matter cannot serve to strip these individuals of their immunity . . . ."); *Hanna v. Drobnick*, 514 F.2d 393, 397 (6th Cir. 1975) ("[The building inspectors'] actions at the time were presumptively valid under a city ordinance which they had no part in adopting and which had not been declared unconstitutional. . . . [W]e perceive no duty on the part of the building inspectors to defy their city's ordinance and their supervisors' instructions by asserting the invalidity of the penalty clause of the ordinance which had not yet been attacked."), *repudiated on other grounds by Thomas v. Shipka*, 818 F.2d 496 (6th Cir. 1987); *see also Prose v. Wendover*, 96 F. App'x 358, 364 (6th Cir. April 27, 2004) ("Because the only court to have considered the ordinance in question, a federal district court, concluded that it was not 'patently and flagrantly unconstitutional,' the officers were entitled to qualified immunity from a claim that they violated the First Amendment by attempting to enforce it.").

The other courts of appeals have taken the same path. *See Vives v. City of New York*, 405 F.3d 115, 117–18 (2d Cir. 2005) (granting qualified immunity to officers because no case established "the proposition that [the statute] is facially unconstitutional"); *Cooper v. Dillon*, 403 F.3d 1208, 1220 (11th Cir. 2005) (granting qualified immunity to officers because "[a]t the time of Cooper's arrest, the statute had not been declared unconstitutional, and therefore it could not have been apparent to Dillon that he was violating Cooper's constitutional rights"); *Blumenthal v. Crotty*, 346 F.3d 84, 104–05 (2d Cir. 2003) (granting qualified immunity to state officials because "enforcement of a presumptively valid statute creates a heavy presumption in favor of qualified immunity"); *Doe v. Heck*, 327 F.3d 492, 516 (7th Cir. 2003) (granting qualified immunity to state officials who enforced corporal-punishment statute later declared unconstitutional because they had

acted within their "statutory authority"); *Lederman v. United States*, 291 F.3d 36, 45, 47 (D.C. Cir. 2002) (granting qualified immunity to officers who arrested plaintiff for distributing leaflets in a "no-demonstration zone" on the Capitol Grounds because while the law contained "profound flaws" and was "astonishing[ly]" broad it was not "so grossly and flagrantly unconstitutional that the officers should have recognized its flaws") (internal quotation marks omitted); *Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994) (granting qualified immunity to officer who arrested plaintiff for demonstrating without a permit because "an officer who reasonably relies on the legislature's determination that a statute is constitutional [and arrests with probable cause] should be shielded from personal liability"); *Swanson v. Powers*, 937 F.2d 965, 968–69 (4th Cir. 1991) (granting qualified immunity to state revenue secretary who enforced a tax later declared unconstitutional because she "was enforcing a long-standing statute" that is presumptively constitutional).

The only case of which I am aware construing *DeFillippo* and denying qualified immunity is *Carey v. Nevada Gaming Control Board*, 279 F.3d 873 (9th Cir. 2002). But in that case "two Ninth Circuit cases [were] directly on point" because they had declared parallel statutes of other States—permitting an arrest for refusing to identify oneself—unconstitutional. *Id.* at 881. That of course does not remotely describe today's case. Nor does *Sandul v. Larion*, 119 F.3d 1250 (6th Cir. 1997), offer any refuge to Leonard. It dealt not with the question whether an officer could be denied qualified immunity for failing to predict a judicial ruling declaring a statute unconstitutional but with whether the statute covered the plaintiff's conduct. *See id.* at 1256 (holding that shouting epithets from a moving car did not provide probable cause to arrest the plaintiff under a disorderly-conduct statute).

In the end, Leonard not only asks us to take a road less traveled but one never traveled. It is one thing to credit police officers with knowledge of all statutory and constitutional rulings potentially bearing on all statutes they enforce; but this necessary requirement needlessly loses any connection with reality when we hold police officers to the standard of anticipating a court's later invalidation of a statute that was duly enacted by legislators sworn to uphold the Constitution, that is presumed constitutional, that has been on the books for 75 years and that has withstood two constitutional challenges. The First Amendment properly protected Leonard from being prosecuted for his unruly speech and conduct—and for now that is enough. To expose Robinson to money damages for enforcing these laws not only seems unfair (*absolute* immunity protects the legislature from similar risks, *Bogan v. Scott-Harris*, 523 U.S. 44, 48–49 (1998)) but also risks placing him in the push-me-pull-me predicament of having to decide which duly enacted laws to enforce and which ones not to enforce on the pain of losing either way—because he is charged with dereliction of duty when he opts not to enforce the law and because he is charged with money damages when he does enforce the law. *See Pierson v. Ray*, 386 U.S. 547, 555 (1967) ("A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does.").

Leonard fares no better under his free-speech retaliation claim. Because probable cause existed to arrest Leonard, as has been shown, our case law forecloses this claim as a matter of law. *See Barnes v. Wright*, 449 F.3d 709, 720 (6th Cir. 2006) ("[T]he defendants had probable cause to seek an indictment and to arrest Barnes on each of the criminal charges in this case. Barnes's First Amendment retaliation claim accordingly fails as a matter of law . . . .").

But even had probable cause been missing, this claim still would fail as a matter of law. No evidence shows that Robinson was doing anything but attempting to restore calm to the disrupted board meeting. Robinson gave no indication of a retaliatory motive. *Cf. Greene v. Barber*, 310 F.3d 889, 892 (6th Cir. 2002) ("'I said, "This is the United States of America and we have freedom of speech here" . . . . [The police officer] answered, "Well, not in my building" . . . .'") (bracket omitted); *Adair v. Charter County of Wayne*, 452 F.3d 482, 492 (6th Cir. 2006) (noting that the

critical issue is "whether the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights").  None of Leonard's speech was directed at Robinson.  And no evidence shows that Robinson had any stake in the dispute between the city and the Leonards.  Prior lawsuits between the city and the Leonards, a feud between the police department and the Leonards and Chief Abraham's apparent "hatred" of Leonard's wife thus do not bear on whether *Robinson* had a retaliatory motive.

The fainthearted suggestion that Chief Abraham had sent Robinson on a retaliatory errand is just that—if not less than that.  "I think," Leonard initially proposes in his deposition testimony, that Robinson "was probably sent there by the chief."  JA 151.  But Leonard then acknowledges that "aside from [his] opinion," he did not "have any facts or any statements from people to support [that] opinion."  *Id*.  The undisputed evidence reveals that Robinson was asked to "swing through" the meeting for 15 to 20 minutes, that Chief Abraham never said "anything negative to [Robinson] about the Leonards" and that no board member had any conversation with Robinson about Mr. Leonard.  JA 138.  The majority seeing these issues differently, I respectfully dissent.