NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0109n.06

**Case No. 16-5322**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Feb 16, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CAREY WOODCOCK, as Administratrix of the estate of Gregory Harrison, deceased | ) ) ) | |
| *Plaintiff-Appellee*, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| CITY OF BOWLING GREEN; DOUG HAWKINS; DONITKA KAY; KEITH CASADA, individually | ) ) ) | |
| *Defendants-Appellants*. | ) ) ) | O P I N I O N |
| and | ) ) | |
| KEVIN WILES; MELANIE WATTS, individually | ) ) ) | |
| *Defendants* | ) ) | |

BEFORE:    COLE, Chief Judge; COOK and WHITE, Circuit Judges.

COLE, Chief Judge.   On August 12, 2012, Officer Keith Casada of the Bowling Green Police Department ("BGPD") fatally shot Gregory Harrison.   Carey Woodcock, the administratrix of Harrison's estate, filed the instant complaint pursuant to 42 U.S.C. § 1983 and various state-law grounds.   The district court granted Woodcock summary judgment as to the

§ 1983 excessive force claim. The district court also granted in part and denied in part defendants' motion for summary judgment.

On appeal, defendants argue that the district court erred in denying summary judgment to (1) Casada on the § 1983 excessive force claim and the state-law battery claim, (2) Sergeant Donitka Kay on the § 1983 failure-to-supervise claim and § 1983 failure-to-intervene claim, (3) Casada and Kay on the § 1983 conspiracy claim, (4) Chief Doug Hawkins and the City of Bowling Green on the state-law vicarious-liability claim, and to (5) all defendants on the wrongful-death claim. Woodcock moved to dismiss this appeal for lack of jurisdiction.

For the following reasons, we reverse the district court's denial of summary judgment on the state-law vicarious-liability claim. We affirm as to all other claims.

## I. BACKGROUND

On August 12, 2012, at approximately 1:26 AM, Harrison placed the first of two phone calls to the BGPD. In the first call, Harrison said, "Yes, I'm on my way to the Louisville Bridge, I wanna beat the hell out of my brother, and if they want me, kill me." (Audio of First Call, R. 46-1, 1:25:58 AM). Casada was dispatched to locate the caller. When the police called back, they learned from a voicemail greeting that the caller's name was "Greg." (Audio of Return Call, R. 46-1, 1:31:06 AM).

Harrison placed a second call to the BGPD at 1:37 AM. The phone call proceeded as follows:

> [Harrison]: Uh, yes, my emergency [slurred] I'm at the T-Mart, I'm'a kill my family, I've asked for help and I've asked for help, [Hanes: 'where are you?'] and they have ignored me. No, no, they have ignored me. You know what? You'll have ignored me.
>
> [Hanes]: We sent someone to where you said you were, where are you right now?
>
> [Harrison]: You know what? I'm gon' kill my brother, I don't give a fuck, my mother-in-law's had a stroke. You know what, I'm down in the parking lot with a gun, by my

[Hanes]: What parking lot?

[buzzing sound] [dial tone]

(Audio of Second Call, R. 48, 1:37:19 AM.)  At 1:39 AM, police dispatch contacted Casada and alerted him of Harrison's second phone call, including Harrison's claim to have a gun.

Sergeant Kay spotted Harrison walking on railroad tracks at 1:47 AM.  Kay stopped her police cruiser ninety to one-hundred-and-fifty feet away from Harrison.  Kay fixed her cruiser's spotlight on Harrison, alerted dispatch that she was "getting out with suspect on tracks," exited her cruiser, and then yelled at Harrison to "put your hands up" and "walk up here to me."  (Dash-cam video, R. 58, 1:46:57 AM.)  Kay continued to yell "show me your hands" and "put your hands up" as Harrison stood motionless.  (*Id.*)

Officers Jordan Wilson and Casada heard Kay's yelling, ran to her location, and stationed themselves on the passenger side of her cruiser, so that the vehicle was between them and Harrison.  During the incident with Harrison, the police blocked off the road and surrounding area and had trains stopped.  Five BGPD officers (Kay, Casada, Wilson, Officer Ernie Steff, and Sergeant Todd Porter) and one Western Kentucky University officer (Brian Kitchens) were at the scene.  There was approximately eighteen feet of grassy area, a curved concrete wall, and the empty left lane of Clay Street between the railroad tracks and Casada and Kay.

During the twelve-minute exchange, Casada and Kay continually and repeatedly yelled for Harrison to "stop," "stop and put your hands up," "stop, don't move," "stop or I will shoot you," and to "sit down."  (*See generally* Dash-cam video, R. 58, 1:47–1:59 AM.)  Harrison ignored these commands and slowly walked along the railroad track parallel to Kay's and Casada's position.  Harrison occasionally stumbled and retraced his steps as he walked, had slurred speech, looked like he had urinated on himself, and appeared intoxicated.  Harrison also repeatedly yelled "shoot me" in response to warnings the officers gave him.  (Casada Use of

Force R., R. 41-1, PageID 552.) During the confrontation, Harrison made no threats or aggressive movements and never said that he had a gun. He had his left hand behind his back, tucked wrist-deep into the waistband of his pants. His left hand remained tucked into his pants for the entire incident; at no point did he move it. At approximately 1:56 AM, Harrison moved out of the dash-cam's view. The dash-cam still captured the audio of the events.

At 1:57 AM, Kay stated over the police radio that "if he takes one more step this way, uh, we're shootin'." (Dash-cam video, R. 58, 1:56:57 AM.) Kay and Casada were told by Sergeant Porter to tell Harrison they were going to shoot him, and they gave the warning. (*Id.*)

A minute and a half later, Kay reported over the police radio that Harrison had apologized to his mother for "whatever it is he's about to do." (Dash-cam video, R. 58, 1:58:42 AM). Following this statement, Casada asked Kay to go around to the driver's side of the cruiser and adjust the spotlight to keep Harrison illuminated. (Casada Dep., R. 44-1, PageID 724.) At 1:59 AM, Kay said "cover me" and went to the driver's side of the cruiser and adjusted the spotlight. (Dash-cam video, R. 58, 1:59:05 AM.) She then returned to the passenger side of the cruiser.

Just before 2:00 AM, Casada shot Harrison, hitting him in the left upper abdomen. Harrison was not facing Kay and Casada when Casada shot him but was standing at a forty-five-degree angle from them, approximately 72 feet away. Officers converged on Harrison and called for an ambulance. Harrison died at the hospital that morning.

The Kentucky State Police investigated the shooting. The investigating officer, then-Detective Laura Phillips, presented the investigation's evidence to the Commonwealth Attorney on August 30, 2012. The Commonwealth Attorney declined criminal prosecution.

Woodcock filed an action in August 2013 asserting seven claims. Those claims were for: excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983; negligence and gross negligence under state law; vicarious liability against defendants City of Bowling Green ("the City"), Hawkins, Wiles, and Watts for the state-law claims against defendants Kay and Casada; common-law battery; the tort of outrage (intentional infliction of emotional distress); wrongful death under Ky. Rev. Stat. § 411.130; and violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131. Both parties moved for summary judgment.

In February 2016, the district court dismissed the claims against defendants Wiles and Watts, conspiracy claims involving anyone other than Kay and Casada, the ADA claim, and the battery claims against anyone other than Casada. The district court also denied qualified immunity to Casada and Kay on the § 1983 claims and granted summary judgment to Woodcock as to the § 1983 claim against Casada. The district court ruled that Casada was not entitled to qualified official immunity under state law. Finally, the district court granted summary judgment to all defendants on the state tort claims except to Casada on the state battery claim, to all defendants on the wrongful-death claim, and to the City of Bowling Green and Hawkins on the vicarious-liability claim.

Defendants filed this interlocutory appeal challenging the denial of qualified immunity under federal law to Casada and Kay, the denial of qualified official immunity under state law to Casada, and the grant of summary judgment to Woodcock as to the § 1983 excessive force claim.

## II. ANALYSIS

### A. Jurisdiction

Woodcock argues that we lack jurisdiction over the appeal. A denial of qualified immunity on purely legal grounds is immediately appealable. *Mitchell v. Forsyth*, 472 U.S. 511,

530 (1985). But we lack jurisdiction to determine "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Kirby v. Duva*, 530 F.3d 475, 480–81 (6th Cir. 2008) (quoting *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995)). Where the material facts are not in dispute, the reasonableness of the use of deadly force "is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). Because the parties agree that there is no dispute of material fact as to the excessive force claim, this appeal raises pure issues of law and we have jurisdiction over it.

To the extent that the defendants make fact-based arguments, we are required to dismiss them. *See Johnson*, 515 U.S. at 313. However, when an appeal makes both factual and purely legal arguments, we can "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005). We therefore deny Woodcock's motion to dismiss the entirety of the appeal.

## B. Standard of Review

We review a district court's grant of summary judgment de novo. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is appropriate where the record shows no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Where, as with the excessive force claim, the facts are undisputed, "[t]he question whether the uncontested facts demonstrated a constitutional violation is a pure question of law." *Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997). We also review de novo a district court's denial of qualified immunity. *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 402 (6th Cir. 2015).

### C. Section 1983 Claims

#### 1. Excessive Force

Qualified immunity shields government officials from civil liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether an official is entitled to qualified immunity, we apply the two-prong *Saucier* test and inquire (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such that "a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 229. Because "it is axiomatic that individuals have a clearly established right not to be shot absent probable cause to believe that they pose a threat of serious physical harm," *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (internal quotation marks omitted), we must determine whether Casada's use of deadly force was unreasonable under the Fourth Amendment.

In prior cases, we have employed a non-exhaustive list of three factors to determine whether an officer's actions were reasonable: "(1) the severity of the crime at issue; (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006). However, the "ultimate inquiry . . . must always be whether the totality of the circumstances justified the use of force." *Mullins*, 805 F.3d at 760 (internal quotation marks omitted). We must judge the reasonableness of the use of force "from the perspective of a reasonable officer on the scene and not through the lens of 20/20

hindsight." *Id.* at 765. This objective reasonableness analysis "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

Turning to the reasonableness factors, we conclude that the severity-of-the-crime factor weighs against Casada. Harrison was, at most, guilty of a misdemeanor at the time of the confrontation, and, although he had voiced a threat against his brother in his calls to the police, his brother was not at the scene and Harrison did not threaten anyone else. Indeed, Harrison called the police himself; this was not a situation where another individual had accused Harrison of threatening or violent behavior.

We also conclude that Harrison did not actively resist arrest, which further weighs against Casada. Kay testified that at no point were the police officers trying to arrest Harrison. Even assuming that the police were trying to arrest Harrison, his conduct did not rise to the level of active resistance. We have held that mere noncompliance is not active resistance. *See Goodwin v. City of Painesville*, 781 F.3d 314, 323–24 (6th Cir. 2015) (holding that refusal to comply with officer's command to step outside his apartment was not active resistance); *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) ("If there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more.").

The crux of this appeal is whether there was probable cause to believe that Harrison posed an imminent threat of serious physical harm to officers or others. "In excessive force cases, the threat factor is 'a *minimum* requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm.'" *Mullins*, 805 F.3d at 766 (quoting *Untalan v. City of Lorain*, 430 F.3d

312, 314 (6th Cir. 2005)) (emphasis in original). The reasonableness of the use of deadly force is measured "based on an 'objective assessment of the danger a suspect poses *at that moment*.'" *Mullins*, 805 F.3d at 766 (quoting *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007)).

Here, based on the totality of the circumstances known to Casada at the time of the incident, the use of deadly force was objectively unreasonable. When Casada arrived on the scene, he knew that Harrison's name was probably "Greg," that he had called the police twice that night, that he had told the police over the phone that he had a gun, and that he had threatened to assault or kill his brother. During the twelve-minute encounter, Casada witnessed Harrison walk slowly down the railroad tracks perpendicular to the police officers, keep his left hand stuffed wrist-deep into the back of his pants, and ignore officers' commands. Casada was aware that Harrison was stumbling, had slurred speech, had possibly urinated on himself, and that there was a "good possibility" he was intoxicated. (Casada Use of Force R., R. 44-1, PageID 704.) Casada had also heard Harrison repeatedly yell "shoot me" in response to warnings the officers gave him and believed Harrison was suicidal. (Casada Use of Force R., R. 41-1, PageID 552.) Soon before the shooting, Casada heard Harrison say his "momma please forgive me" statement. However, Casada did not shoot Harrison for nearly a minute after Harrison made this statement, which defendants characterize as a "final declaration." At no point during the twelve-minute encounter did Casada see Harrison attack or threaten anyone. Casada also saw that Harrison never moved his left hand from inside his pants. When Casada fired, Harrison was standing approximately 72 feet away from him and was not directly facing the officers.

The cases Casada cites in arguing that he acted reasonably are distinguishable. In *Simmonds v. Genesee County*, the suspect yelled "I have a gun" to the officers and pointed a silver object at the officers as though it were a weapon. 682 F.3d 438, 445 (6th Cir. 2012). In

*Pollard*, the suspect reached down to the floor of his vehicle and then clasped his hands into a shooting posture, pointing at the officers on the scene. 780 F.3d at 403. We said that it was these facts that "weigh[ed] most heavily in assessing the officers' split-second decision to shoot." *Id.* The court emphasized the "'tense, uncertain and rapidly evolving' nature of the altercation." *Id.* (quoting *Graham*, 490 U.S. 386, 397 (1989)).

Here, the incident lacked the essential elements that permitted the use of force in *Simmonds* and *Pollard*. Harrison displayed none of the aggression that the suspects did in *Simmonds* and *Pollard*. Casada may have thought that Harrison had a gun, but Harrison never gave Casada reason to think that he would use it imminently. The suspects in *Simmonds* and *Pollard* pointed objects at the officers; Harrison never moved his left arm. Casada argues that he faced a split-second decision, but the record shows that Casada and Kay agreed that Casada would shoot if Harrison moved past the point illuminated by the searchlight. Casada also did not shoot Harrison immediately after hearing his final declaration. He waited just over a minute, and asked Kay to run around the police car to move the searchlight. Harrison's shooting lacked the exigency, tension, or rapid evolution present in *Simmonds* and *Pollard*. When Casada fired the shot, he had no reason to believe that Harrison posed an imminent threat of serious harm to anyone. Accordingly, his use of deadly force was objectively unreasonable and violated the Fourth Amendment.

### 2. *Failure to Supervise Claim*

First, Kay makes factual arguments that we cannot review on interlocutory appeal. Second, Kay argues that Casada did not violate the Constitution, and that there can thus be no supervisory liability. Because Casada violated the Fourth Amendment, we conclude that the district court properly denied Kay summary judgment.

### 3. Failure to Intervene Claim

Kay argues that she did not fail to intervene because there was no constitutional violation to prevent. Because Casada violated the Fourth Amendment, we conclude that the district court properly denied Kay summary judgment.

### 4. Conspiracy Claim

Defendants argue that the intracorporate conspiracy doctrine bars the civil conspiracy claim. However, we have never held that the doctrine applies to claims under § 1983. *See DiLuzio v. Village of Yorkville, Ohio*, 796 F.3d 604, 615–16 (6th Cir. 2015). We decline to do so here as there is a genuine dispute of fact about whether Casada and Kay made an agreement to injure Harrison by unlawful action. We, therefore, lack jurisdiction to consider this claim on interlocutory appeal.

## D. State-Law Claims

### 1. Qualified Official Immunity

In Kentucky, "qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment, (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citations omitted). The Kentucky Supreme Court has held that "in the context of qualified official immunity, 'bad faith' can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.,* objective unreasonableness." *Id.* And courts have held that "this inquiry tracks the inquiry for objective reasonableness and qualified immunity." *Turner v. Hill*, No. 5:12-CV-

00195-TBR, 2014 WL 549462 at *9 (W.D. Ky. Feb. 11, 2014). Accordingly, we hold that Casada is not entitled to qualified official immunity because a jury could conclude that he acted in bad faith by violating a clearly established constitutional right.

### 2. *Battery*

Under Kentucky law, a defendant's use of deadly force is privileged "when the defendant believes that such force is necessary to protect himself against death [or] serious physical injury." KRS 503.050(2). This standard does not identically track the federal standard. Casada argues on appeal that he did believe that deadly force was necessary to protect himself. This argument is entirely factual and thus unreviewable on interlocutory appeal.

### 3. *Vicarious Liability*

The district court erred in not granting summary judgment to Hawkins on the vicarious-liability claim. As the district court held in regards to another claim, Hawkins was entitled to qualified official immunity because the manner of supervision and enforcement of a use-of-force policy is a discretionary act or function, *see Walker v. Davis*, 643 F. Supp. 2d 921, 933–34 (W.D. Ky. 2009), and Woodcock failed to show bad faith on the part of Hawkins. *Woodcock v. City of Bowling Green, et al.*, 165 F. Supp. 3d 563, 607–08 (W.D. Ky. 2016). This grant of qualified official immunity precludes Hawkins from being held liable under a theory of vicarious liability. *See Rowan County v. Sloas*, 201 S.W.3d 469, 476–77 (Ky. 2006) ("[T]here can be no vicarious liability which pierces immunity, if immunity is found to be applicable."). Hawkins is, therefore, entitled to summary judgment on the vicarious liability claim.

However, the district court properly denied summary judgment to the City of Bowling Green. A city "is immune only for torts committed in the performance of legislative or judicial or quasi-legislative or quasi-judicial functions, and can otherwise be held vicariously liable for

the torts of its employees." *Schwindel v. Meade Cty.*, 113 S.W.3d 159, 165 (Ky. 2003); *see also Comair, Inc. v. Lexington-Fayette Urban Cty. Airport Corp.*, 295 S.W.3d 91, 95 (Ky. 2009) ("Cities . . . while enjoying some immunity for much of this state's history, are now liable for negligent acts outside the legislative and judicial realms.").  And Kentucky courts have held that a police officer's duties do not fall under this exemption, making cities liable for their torts. *See Ashby v. City of Louisville*, 841 S.W.2d 184, 188 (Ky. Ct. App. 1992).  The City's only other argument on appeal is that summary judgment is warranted because Casada did not commit the underlying tort of battery.  But since we conclude that the battery claim can go forward, the district court properly denied the City summary judgment.

*4.  Wrongful Death*

Defendants' only argument on appeal is that summary judgment is warranted because Casada did not commit the underlying tort of battery.  Because we conclude that the state battery claim can go forward, we hold that the district court properly denied summary judgment.

### III.  CONCLUSION

For the foregoing reasons, we reverse the district court's denial of defendants' motion for summary judgment on the state vicarious-liability claim against Hawkins.  We affirm the remainder of the district court's judgment.