NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0499n.06

No. 18-5005

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| TROY K. SCHEFFLER, | ) | **FILED** |
| | ) | Oct 05, 2018 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | |
| ALEX LEE, In his individual capacity for actions | ) | ON APPEAL FROM THE |
| under color of law as a Louisville/Jefferson County | ) | UNITED STATES DISTRICT |
| Metro police officer; MICHAEL CARROLL, In his | ) | COURT FOR THE WESTERN |
| individual capacity for actions under color of law as | ) | DISTRICT OF KENTUCKY |
| a Louisville/Jefferson County EMT; LOUISVILLE | ) | |
| JEFFERSON COUNTY METRO GOVERNMENT, | ) | OPINION |
| | ) | |
| Defendants-Appellees, | ) | |
| | ) | |
| CITY OF LOUISVILLE, KENTUCKY, | ) | |
| | ) | |
| Defendant. | ) | |

BEFORE:    COOK, STRANCH, and NALBANDIAN, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Troy Scheffler was arrested for alcohol intoxication and disorderly conduct while visiting Louisville, Kentucky. He subsequently filed suit, alleging several federal and state law violations stemming from the arrest. The district court granted summary judgment in favor of the defendants on all claims. Scheffler appeals, and for the reasons that follow, we **AFFIRM** in part and **REVERSE** in part the district court's decision and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

In May 2013, Troy Scheffler, a Minnesota resident, accompanied his friend Sean Burkett on a trip to Louisville, Kentucky.  They stayed in room 1005 at a large, two-tower hotel called the Galt House.  Scheffler suffers from agoraphobia and panic disorder and spent most of the day of May 17 alone in the hotel.  Later that evening, he attempted to meet up with Burkett.  Due to Burkett's intoxication, Scheffler had difficulty finding him and stopped by multiple establishments, including several bars, before eventually locating him.  Scheffler denies consuming any alcohol during that outing or at any other point that day.  Upon reuniting, Scheffler and Burkett decided to return to the Galt House; Scheffler continued on alone when Burkett stopped for food along the way.  When he returned to the Galt House, Scheffler briefly stopped by the lobby to ask in which of the towers his room was located.  A security guard, Jordan Keister, gave him directions.  As Scheffler continued to his room, he noticed Keister following him.  Scheffler confronted Keister, and Keister denied following him but continued to mimic Scheffler's movements.  Scheffler asked to speak to a supervisor, and the two men returned to the lobby.  Scheffler waited by the concierge desk for security supervisor Tim Howard.  Off-duty police officer Alex Lee was sitting at the desk; he inserted himself into the conversation and repeatedly requested Scheffler's identification, which Scheffler refused to give.  Much of the interaction between Scheffler and Lee was recorded by hotel security cameras.

Believing he was being unlawfully detained, Scheffler called 911, asking that a sheriff's deputy be dispatched to mediate the situation; the dispatcher agreed to send a supervising officer.  Scheffler then exited the lobby, telling the dispatcher that he would be outside.  Lee followed Scheffler and continued to demand his identification.  Scheffler walked down the sidewalk, stating his intention to wait for the supervising officer on public property.  Lee instructed Scheffler that

he would be arrested if he did not cooperate, eventually telling Scheffler that he would be arrested for alcohol intoxication. When Scheffler responded in disbelief, Lee said, "[T]hat's what we'll call it." Scheffler continued to walk away and, moments later, Lee arrested Scheffler, allegedly throwing him against a parked car in the process. Scheffler does not allege that he was injured as a result of Lee's action.

Scheffler was then placed in Lee's police vehicle, at which point he began to have a panic attack. Scheffler asked to be taken to the hospital, and Lee contacted emergency medical technicians (EMTs). EMTs Michael Carroll and Stephanie Albertson responded and transported Scheffler to the hospital in an ambulance; Lee followed in his police vehicle. While in the ambulance, Carroll gave Scheffler a sternum rub—a medical procedure designed to rouse an unresponsive patient. At the hospital, Scheffler was given an electrocardiogram test and evaluated for acute alcohol intoxication. He was discharged approximately two hours after his arrest and taken to jail.

Scheffler was charged with alcohol intoxication and disorderly conduct, both misdemeanors under Kentucky law. The Commonwealth offered to dismiss the charges in exchange for Scheffler's stipulation that probable cause existed for his arrest and his agreement not to sue. Scheffler turned down the offer and proceeded to trial. The jury found Scheffler not guilty on both counts after approximately ten minutes of deliberation. Scheffler subsequently filed a complaint with the Louisville Metro Police Department Professional Standards Unit (PSU) against Lee. The PSU investigated, interviewed several witnesses, and ultimately found in favor of Lee.

Scheffler then filed a pro se lawsuit raising, in relevant part, a First Amendment retaliation claim and Fourth Amendment false arrest and excessive force claims against Lee; Kentucky

common law false imprisonment, battery, and malicious prosecution claims against Lee; and a Kentucky common law battery claim against Carroll.[1]  Scheffler secured counsel during the pendency of the litigation before the district court—after he filed his amended complaint but before he was deposed and before the summary judgment motion was litigated.  The defendants filed a motion for summary judgment on all counts, which the district court granted in full.  This appeal followed.

## II.  ANALYSIS

### A.  Standard of Review

We review the district court's grant of summary judgment de novo.  *Harris v. Bornhorst*, 513 F.3d 503, 509 (6th Cir. 2008).  Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."  *Id.* (quoting Fed. R. Civ. P. 56(c)).  Construing the evidence in the light most favorable to the non-moving party "usually means adopting the plaintiff's version of the facts."  *Coble v. City of White House*, 634 F.3d 865, 868 (6th Cir. 2011).  There is a limited exception to our standard summary judgment analysis when video or audio evidence exists and "so utterly discredit[s]" the plaintiff's story that "no reasonable jury could believe it."  *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  A factual dispute is material if its resolution "might affect the outcome of the suit," and it is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determining witness credibility, weighing evidence, and drawing legitimate

---

[1] Scheffler also sued Frederick Asset Protection (FAP), Louisville/Jefferson County Metro Government, and the City of Louisville.  He settled with FAP and does not pursue any claims against the municipal entities on appeal.

inferences are the province of the jury and cannot be conducted by a court at the summary judgment stage. *Id.* at 255.

### B. Qualified Immunity

Lee asserts qualified immunity as a defense to Scheffler's state and federal claims.

Officers sued pursuant to 42 U.S.C. § 1983 "enjoy qualified immunity . . . when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *King v. Harwood*, 852 F.3d 568, 582 (6th Cir. 2017) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). To preclude qualified immunity, the right in question "must have been clearly established in a particularized sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011) (citation, ellipses, and internal quotation marks omitted). Though qualified immunity provides "ample room for mistaken judgments," *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citation omitted), and "'protects all but the plainly incompetent or those who knowingly violate the law,' 'a reasonably competent public official should know the law governing his conduct,'" *D.D. v. Scheeler*, 645 F. App'x 418, 427 (6th Cir. 2016) (quoting *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009), and *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)). In conducting the qualified immunity analysis, we must view the evidence in the light most favorable to the injured party, *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015), and consider "only the facts that were knowable" to the defendants, *King*, 852 F.3d at 582 (citation omitted).

Kentucky law also recognizes a qualified immunity defense for public officials, commonly referred to as "qualified official immunity." Officials are entitled to qualified immunity for "good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510,

522 (Ky. 2001); *see also Martin v. O'Daniel*, 507 S.W.3d 1, 5 (Ky. 2016), *as corrected* (Sept. 22, 2016). To defeat qualified official immunity, the plaintiff must establish that the defendant's "act was not performed in good faith." *Yanero*, 65 S.W.3d at 523.

> To show that a peace officer acted in bad faith when making an on-the-spot judgment call, the complainant must demonstrate that the officer "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate" the complainant's rights or that the officer "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury."

*Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. Ct. App. 2007) (emphases and ellipsis omitted) (quoting *Yanero*, 65 S.W.3d at 523). Thus, the qualified official immunity analysis under Kentucky law "tracks the inquiry for objective reasonableness and qualified immunity" under federal law. *Woodcock v. City of Bowling Green*, 679 F. App'x 419, 425 (6th Cir. 2017) (citation and internal quotation marks omitted).

## C.     Fourth Amendment False Arrest Claim Against Lee

Scheffler claims that Lee arrested him without probable cause in violation of the Fourth Amendment. The district court concluded that Lee had probable cause to arrest Scheffler for alcohol intoxication and therefore did not reach the question of whether there was probable cause for disorderly conduct.

In the context of a false arrest claim brought pursuant to 42 U.S.C. § 1983, "an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Harris*, 513 F.3d at 511. If, on the other hand, no reasonably competent officer would have found probable cause, the arresting officer is not entitled to qualified immunity. *See Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007).

"[W]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law. Put differently, state law defines the offense for which an officer may arrest a person, while federal law dictates whether probable cause existed for an arrest." *Kennedy*, 635 F.3d at 215 (citation and internal quotation marks omitted). Probable cause exists when "the facts and circumstances within the officers' knowledge" are "sufficient to warrant a [person] of reasonable caution to believe that an offense had been, was being, or was about to be committed." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007). This is an objective inquiry; it matters not whether the officer subjectively believed that he had probable cause for an arrest. *Id.*

The offenses at issue here are alcohol intoxication, Ky. Rev. Stat. § 222.202(1), and disorderly conduct, *id.* § 525.060(1). If probable cause existed as to either offense, Scheffler's false arrest claim fails. *See Amis v. Twardesky*, 637 F. App'x 859, 861 (6th Cir. 2015) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153, 155 (2004)).

### 1. Alcohol Intoxication

Under Kentucky law, "[a] person is guilty of alcohol intoxication when he appears in a public place manifestly under the influence of alcohol to the degree that he may endanger himself or other persons or property, or unreasonably annoy persons in his vicinity." Ky. Rev. Stat. § 222.202(1). In other words, alcohol intoxication "requires some behavior that manifests, meaning exhibits or demonstrates, alcohol intoxication to the degree that [the suspect] may endanger himself or other persons or property, or unreasonably annoy persons in his vicinity." *Maloney v. Commonwealth*, 489 S.W.3d 235, 239 (Ky. 2016) (citation and internal quotation marks omitted). The Kentucky Supreme Court found that probable cause for alcohol intoxication existed when the suspect was "staggering, unsteady on his feet, smelled of alcohol, and had to lean against the car to remain upright and keep from falling." *Dawson v. Commonwealth*, No. 2004-

SC-0561-MR, 2006 WL 436057, at *1 (Ky. Feb. 23, 2006). By contrast, in a case applying Kentucky law, we found probable cause lacking when the plaintiff admitted that "he had consumed two beers," had in his possession a cup of liquor, and was crouching down by his car, "perhaps appearing to be trying to vomit." *Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 628 (6th Cir. 2011). In *Haley*, we affirmed the district court's denial of summary judgment on the basis of qualified immunity because "a reasonable officer could not have found the elements of the statutory offense of alcohol intoxication." *Id.*

According to Lee, he had probable cause to arrest Scheffler for alcohol intoxication because Scheffler "appeared intoxicated with alcohol," smelled of alcohol, had a flushed face, pink glassy eyes, spoke with slurred speech, and walked with unsteady feet. Lee asserted that when Scheffler first stopped by the hotel lobby just before one in the morning, he asked about the hotel bar and seemed "gigglish" and happy; when Scheffler was informed that the bar was closing imminently, he said something to the effect of "maybe that's enough for today." Lee also claimed that Scheffler was loud and uncooperative, that his voice got louder and louder during their exchange, and that he believed Scheffler was causing an annoyance to the hotel staff and to people in the lobby. Based on these observations, Lee states that he believed Scheffler was manifestly under the influence of alcohol; that he might endanger himself, others, or property; and that he was causing an unreasonable annoyance to the staff and to others in the lobby.

Scheffler disputes many of these assertions. He claims that he had consumed absolutely no alcohol on the day he was arrested and that he was not intoxicated. He testified that he took his prescription Xanax medication but no other pharmaceutical or illicit substances that day. He also denied asking about the bar when he first stopped by the lobby; according to Scheffler, he only asked about the location of room 1005. Scheffler testified that he used an "indoor voice"—rather

than an "outdoor voice"—both in the hotel lobby and on the sidewalk; that he never swore at Lee or anyone else at the Galt House; that he never conducted himself in a loud, boisterous, or threatening manner toward the people around him; that he did not act in a manner that presented a threat to himself or others; and that he did not make physical contact with Lee or anyone else. (R. 100-2, Scheffler Dep., PageID 766–69) According to Scheffler, passersby seemed to be unconcerned with the situation, and he never saw anyone attempt to get the attention of hotel employees. (*Id.*, PageID 767–68)

These disputed facts go directly to whether Lee had probable cause to arrest Scheffler for alcohol intoxication. At summary judgment, we credit Scheffler's version of events, resolving these factual disputes in his favor. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Coble*, 634 F.3d at 868. Because there are both video and audio tapes covering a substantial part of the interaction at issue, we look to whether this objective evidence "so utterly discredit[s]" Scheffler's version of events that no reasonable jury could believe it. *Coble*, 634 F.3d at 868 (citation and internal quotation marks omitted).

We look first to the most relevant video and audio evidence: security video from the Galt House and the 911 call recording, both of which depict the events leading up to Scheffler's arrest. The video shows, as Lee has formally admitted in discovery,[2] that Scheffler does not appear unsteady on his feet, intoxicated, or alcohol-impaired. (*See generally* R. 100, Ex. C, Galt House Video; *see also* R. 100-8, Lee's Answers to Requests for Admissions, PageID 822) Scheffler does not appear to unreasonably annoy anyone or to physically endanger himself, others, or property; guests and patrons pass by in close proximity without stopping or appearing to notice what is

---

[2] A matter admitted pursuant to Federal Rule of Civil Procedure 36 is "conclusively established" unless the court permits the party to amend or withdraw it. *Goodson v. Brennan*, 688 F. App'x 372, 376 (2017) (quoting Fed. R. Civ. P 36(b)). It cannot be "overcome at the summary judgment stage by contradictory affidavit testimony or other evidence in the record." *Id.* (citation omitted).

happening at the desk. (*See* R. 100-8, PageID 822–24; R. 100, Ex. C, 1:11:15–1:11:27, 1:12:00–1:12:08, 1:12:46–1:13:06)  The video shows Scheffler shake hands with Howard, the hotel's security supervisor, and that Howard's body language remains relaxed throughout their conversation, suggesting neither fear nor unease. (*See* R. 100, Ex. C, 1:08:37–1:08:40, 1:08:42–1:14:10)

Scheffler sounds coherent and relatively calm on the 911 call recording; he does not slur or otherwise speak in a manner that would suggest he is intoxicated. (*See id.*, 1:12:20–1:16:30; *see also* R. 100, Ex. F, Audio Recording of 911 Call)  Scheffler does not yell or raise his voice during the recording; he states his name and phone number clearly and, when asked to give the phone to Lee, he complies once he is assured that the call is being recorded. (R. 100, Ex. C, 1:12:52–1:13:10, 1:15:02–1:15:29)  Although there is some confusion regarding the dispatcher's ability to send sheriff's deputies as opposed to a supervising police officer, the video indicates that any such confusion may have been caused by Scheffler simultaneously responding to Lee's repeated requests for his identification, not intoxication. (*See id.*, 1:13:50–1:14:14)  Far from blatantly contradicting Scheffler's version of events, the Galt House video and the 911 call recording lend support to several of Scheffler's assertions—and call into question some of Lee's.

Defendants also address Lee's squad car video, captured in the wake of the arrest.  Because this video was captured after the arrest, anything Lee observed in the vehicle was not known to him at the time of arrest and therefore cannot be part of his probable cause calculus. *See Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010) (instructing that the court is to consider the facts and circumstances known to the officer "at the moment of the arrest"); *Harris*, 513 F.3d at 513–14 (holding that the district court erred in considering information that was unknown at the time of arrest).  In addition, to the extent the Defendants argue that the video is relevant to Scheffler's pre-

arrest conduct and appearance of intoxication, it is of questionable value. Scheffler's speech does sound slower and possibly slurred as compared to the earlier recording and his behavior is more erratic. Before the video was made, however, Scheffler was arrested and began experiencing a panic attack, which he told Lee. Either of those circumstances could have had a bearing on Scheffler's conduct, including his manner of speech and level of emotion. Thus, the squad car video does not blatantly contradict Scheffler's version of the prearrest events. *See Carter v. City of Wyoming*, 294 F. App'x 990, 992 (6th Cir. 2008) (concluding that the videotape did not blatantly contradict the plaintiff's description of events because it did not even "purport to cover" portions of the incident). That is particularly clear here because the prearrest events are the subject of separate video and audio recordings.

In addition to the audio and video recordings, the record contains Scheffler's medical records and several sworn witness statements collected during the PSU investigation. Hospital records indicate that Scheffler was evaluated for "[a]cute alcohol intoxication" after his arrest, and triage and nursing progress notes make reference to intoxication. The notes also state that Scheffler was alert, fully oriented, and did not pose a fall risk, all of which could suggest that he did not appear intoxicated, or at least not to a serious degree.[3] Additionally, there was no record of results from a blood or urine test, so the notes were presumably based on some combination of observation and information provided by Lee, the EMTs, and Scheffler. Thus, Scheffler's medical records are akin to normal witness accounts that, even when they contradict the plaintiff's version of events, rarely so utterly discredit it that no reasonable jury could believe it. *See Coble*, 634 F.3d at 869–70; *see also Penn. R.R. Co. v. Chamberlain*, 288 U.S. 333, 338 (1933) ("It, of course, is true,

---

[3] During triage, at 2:13 a.m., and again at 2:45 a.m., Scheffler was "[a]lert" and "[o]riented x 4." Elsewhere, the notes state that Scheffler was "[o]riented x 3. Altered mental status. (Intoxicated and uncooperative)." A jury might infer that describing Scheffler as "alert" and "oriented x 4" implied that he did not have an altered mental status (i.e., was not intoxicated) at that time.

-11-

generally, that where there is a direct conflict of testimony upon a matter of fact, the question must be left to the jury to determine, without regard to the number of witnesses upon either side.").

The same is true of other witness statements collected by the PSU that may tend to contradict elements of Scheffler's story and support some of Lee's. Galt House employees and EMT Carroll described Scheffler as intoxicated, but their reports vary in terms of how intoxicated Scheffler appeared, with some witnesses describing Scheffler as only "slightly intoxicated." They also vary in their descriptions of Scheffler's behavior and whether he was loud or disruptive, and they contain other contradictions and inconsistencies about what transpired that night.

Crediting Scheffler's testimony about his actions before the arrest and considering the Galt House video and 911 recording, Scheffler consumed no alcohol that day; did not stumble or otherwise appear unsteady on his feet; did not slur his speech; did not yell, swear, or speak in an unreasonably loud manner; and did not act in a threatening manner. Passersby visible in the Galt House video appear unbothered and unalarmed, and Howard appears unconcerned. Thus, construing the evidence in the light most favorable to Scheffler, Lee lacked probable cause to arrest him for alcohol intoxication—that is, being "manifestly under the influence of alcohol to the degree that he may endanger himself or other persons or property, or unreasonably annoy persons in his vicinity." Ky. Rev. Stat. § 222.202(1). Furthermore, no reasonable officer would have found probable cause for the arrest. *See D.D.*, 645 F. App'x at 427 (holding that the officer was not entitled to qualified immunity because "no competent officer would have found probable cause to arrest S.D." (citing *Leonard*, 477 F.3d at 355)); *Haley*, 452 F. App'x at 627–28.

### 2. Disorderly Conduct

We next consider whether Lee had probable cause to arrest Scheffler for disorderly conduct. Kentucky law provides that:

A person is guilty of disorderly conduct in the second degree when in a public place and with intent to cause public inconvenience, annoyance, or alarm, or wantonly creating a risk thereof, he:

> (a) Engages in fighting or in violent, tumultuous, or threatening behavior;
> (b) Makes unreasonable noise;
> (c) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard, or other emergency; or
> (d) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.

Ky. Rev. Stat. § 525.060(1). "Kentucky law does not criminalize arguments and noise that disturb only police officers because such conduct does not risk *public* alarm." *Kennedy*, 635 F.3d at 215–16.

As discussed above, crediting Scheffler's testimony along with the Galt House video and 911 recordings, he never yelled or raised his voice, did not swear at Lee or anyone else, and did not engage in threatening or violent behavior. As Lee formally admitted, Scheffler does not appear to cause inconvenience, annoyance, or alarm to anyone in the video; people walking through the lobby do not seem to notice or be bothered by the exchange. (*See* R. 100-8, PageID 822–24; R. 100, Ex. C, 1:11:15–1:11:27, 1:12:00–1:12:08, 1:12:46–1:13:06) A jury could therefore conclude that Scheffler's behavior did not cause a risk of public annoyance or alarm, Ky. Rev. Stat. § 525.060, and that he did not engage in violent or threatening behavior, *id.* § 525.060(a), make unreasonable noise, *id.* § 525.060(b), or create a hazardous or physically offensive condition, *id.* § 525.060(d).[4] Thus, there is a dispute of fact as to whether Lee had probable cause to arrest Scheffler for disorderly conduct—and whether any reasonable officer would have found probable cause under the circumstances. *See Kennedy*, 635 F.3d at 215–16 (denying qualified immunity

---

[4] Lee admits that he never issued an order to disperse, Ky. Rev. Stat. § 525.060(c). (*See* R. 100-8, PageID 823–24)

because no reasonable officer would have found probable cause to arrest the plaintiff for disorderly conduct where there was a dispute of fact whether the plaintiff made unreasonable noise and the circumstances minimized the chance of annoyance or alarm to the public).

In sum, genuine disputes of material fact preclude granting summary judgment to Lee on Scheffler's false arrest claim.

### D.      Kentucky Common Law False Imprisonment Claim Against Lee

Kentucky law defines false imprisonment[5] as "any deprivation of the liberty of one person by another or detention for however short a time without such person's consent and against his will, whether done by actual violence, threats or otherwise." *Banks v. Fritsch*, 39 S.W.3d 474, 479 (Ky. Ct. App. 2001). It "requires that the restraint be wrongful, improper, or without a claim of reasonable justification, authority or privilege." *Id.* An officer "is liable for false imprisonment unless he or she enjoys a privilege or immunity to detain an individual." *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007).

> Two common examples of a law enforcement officer's privilege to detain an individual are (1) an arrest pursuant to a warrant or (2) an arrest without a warrant in which the officer has probable cause, that is, reasonable objective grounds to believe that a crime was committed and that the plaintiff committed it.

*Id.* (citation and internal quotation marks omitted). As discussed above, officials are entitled to qualified immunity under Kentucky law when they make "good faith judgment calls . . . in a legally uncertain environment." *Yanero*, 65 S.W.3d at 522; *see also Smith v. Norton Hosps., Inc.*, 488 S.W.3d 23, 31 n.7 (Ky. Ct. App. 2016) ("[I]n an action for false imprisonment . . . the focus is on whether the peace officer had reasonable grounds to believe and did believe in good faith that the

---

[5] Scheffler asserts false imprisonment and false arrest common law claims but acknowledges that Kentucky law treats them similarly. "[I]n instances involving officers of the law there is simply no distinction between false arrest and false imprisonment." *Lexington-Fayette Urban Cty. Gov't v. Middleton*, 555 S.W.2d 613, 619 (Ky. Ct. App. 1977). Following the Kentucky Supreme Court's lead, we refer to this claim as false imprisonment. *See Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007).

plaintiff had committed an arrestable offense . . . ." (citation and internal quotation marks omitted)).

The analysis of Scheffler's false imprisonment claim duplicates that of his false arrest claim. Having determined that Lee is not entitled to qualified immunity on the former, he is similarly not entitled to qualified official immunity on the latter. Summary judgment was therefore improperly granted to Lee on this claim.

**E.      Fourth Amendment Excessive Force Claim Against Lee**

Scheffler argues that Lee used excessive force in effectuating the arrest, specifically by slamming him against a car.[6] The district court concluded that Lee did not use excessive force because "a reasonable officer would have considered [Scheffler] to be a flight risk." The court based this conclusion on Scheffler's statement that he walked outside and down the sidewalk after he was told that he was being detained and after Lee told him that he would be arrested if he did not cooperate.

The Fourth Amendment prohibits police use of excessive force. *See Graham v. Conner*, 490 U.S. 386, 394–95 (1989). Law enforcement officers may, however, use reasonable force when making an arrest. *See id.* at 395–96. Whether a particular use of force is reasonable is an objective question and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. In conducting this fact-intensive inquiry, we consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* An excessive force claim "may be established through evidence of severe injury or physical contact," but such evidence is not required. *Morrison v. Bd. Of Trs. Of Green*

---

[6] Scheffler has abandoned on appeal any claim based on overly tight handcuffs.

*Twp.*, 583 F.3d 394, 407 (6th Cir. 2009); *see also id.* (injury is not "crucial" in an excessive force claim (citation omitted)).

Officers are entitled to qualified immunity on excessive force claims unless it was clearly established, in a particularized sense, that their use of force was unreasonable. *See Mullinex v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam). It is clearly established that officers "may not use force on a subdued, non-resisting subject." *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008) ("[T]he right to be free from physical force when one is not resisting the police is a clearly established right."); *see also Folks v. Petitt*, 676 F. App'x 567, 572 (6th Cir. 2017) ("As far back as 1999, this court has held that slamming a compliant, non-resisting suspect into a stationary object during an arrest constitutes excessive force."); *Smoak v. Hall*, 345 F. App'x 134, 140 (6th Cir. 2009) ("The law is clear that force can easily be excessive if the suspect is compliant. There is no government interest in striking someone who is neither resisting nor trying to flee." (citations, ellipsis, and internal quotation marks omitted)).

There is no dispute that Lee used some force in arresting Scheffler: Lee admits that he grabbed Scheffler and pushed him against a car. (*See* R. 100, Ex. J, PSU Report, Page 165 of 301) The amount of force used and the reason behind it—i.e., whether Lee slammed Scheffler against a car or merely pushed him against it to prevent him from falling during the arrest—is in dispute, as are some of the circumstances leading up to the arrest.

A jury can "reasonably find that slamming an arrestee into a vehicle constitutes excessive force when the offense is non-violent, the arrestee posed no immediate safety threat, and the arrestee had not attempted to escape and was not actively resisting." *Miller v. Sanilac County*, 606 F.3d 240, 253–54 (6th Cir. 2010). This is so even if the plaintiff was not "hurt" by the officer's use of force. *Id.* at 252. In *Miller*, this court denied qualified immunity to an officer who, in the

course of making an arrest, "spun [the plaintiff] around, slammed him against his vehicle, and kicked his feet apart." *Id.* at 252. *Miller* acknowledged, however, that the excessive force claim in that case "admittedly c[ame] close to the 'scintilla of evidence' of excessive force this Court has previously found to be insufficient to survive summary judgment." *Id.* at 253 (citations omitted).

In this case, there is no dispute that the crimes at issue were minor or that Scheffler did not pose an immediate risk to Lee or to others. The key question is whether Scheffler resisted arrest or attempted to flee. According to Scheffler, he did not resist in any fashion while Lee was arresting him. But Scheffler also testified that, while still in the lobby, he asked Lee, "Are you detaining me?" and Lee responded, "Yes." After being told he was detained, Scheffler turned and left the lobby. The Galt House video, which we may properly consider for the reasons discussed above, shows that, when Scheffler walked outside the hotel lobby, he told the 911 dispatcher that he would be "standing outside." He did not name the specific location where he would be waiting, nor did he ask permission of the officer who allegedly had told him he was detained. And when he began to walk down the sidewalk, Scheffler announced only that he was walking "down here." While Scheffler was walking, Lee asked for his identification and twice warned him that he would be arrested if he did not cooperate. Scheffler did not stop walking and instead reiterated that he was "walking down the sidewalk." Crediting Scheffler's own allegations and the undisputed video evidence, Lee had taken appropriate preliminary measures by informing Scheffler that he was detained and warning him twice that he would be arrested if he did not cooperate. When Scheffler thereafter continued to walk away, the only way Lee could effectuate an arrest was to use *some* level of force.

To be sure, the use of force might still be unreasonable if it were shown to be, for example, "gratuitous," *Miller*, 606 F.3d at 252 (quoting *Morrison*, 583 F.3d at 407), or "wildly

disproportionate," *Goodrich v. Everett*, 193 F. App'x 551, 557 (6th Cir. 2006). Scheffler makes no argument along these lines, only reiterating conclusory assertions that he was not fleeing or resisting arrest. He asserts generally that Lee "threw" or "slammed" him against a car, but the only specific detail he provides about the altercation is that he dropped his cell phone as a result. Lee did not injure Scheffler, nor did he continue to apply force after Scheffler was cuffed. There is not even an allegation that Lee spun Scheffler around or kicked his legs apart, as in *Miller*. *See* 606 F.3d at 252. Under the circumstances, Scheffler's description of being slammed or thrown against the car constitutes at best "the 'scintilla of evidence' of excessive force this Court has previously found to be insufficient to survive summary judgment." *Id.* at 253; *see also Goodrich*, 193 F. App'x at 557. Lee is therefore entitled to qualified immunity on this count.

F.      **Kentucky Common Law Battery Claim Against Lee**

Kentucky caselaw defines common law civil battery as the "unlawful touching of the person of another." *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000) (citation omitted). "[A]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other . . . and (b) a harmful contact with the person of the other directly or indirectly results." *Id.* (quoting Restatement (Second) of Torts § 13 (1965)). The defendant must intend to "make contact with the person" but need not intend to cause harm. *Id.* at 657–58.

An officer sued in his individual capacity is shielded from liability if "he used no more force than was reasonably necessary, or so appeared to him in the exercise of reasonable judgment, in order to effect the arrest." *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. 1973). Here again, the analysis of the state law battery claim duplicates that of the federal constitutional claim.

Having determined that Lee is entitled to qualified immunity on the former, he is likewise entitled

to qualified official immunity on the latter.

### G.      Kentucky Common Law Malicious Prosecution Claim Against Lee

Kentucky recognizes a common law claim of malicious prosecution.[7]  To make out such a

claim, the plaintiff must show that:

> 1) the defendant initiated, continued, or procured a criminal or civil judicial
> proceeding, or an administrative disciplinary proceeding against the plaintiff;
> 2) the defendant acted without probable cause;
> 3) the defendant acted with malice, which, in the criminal context, means seeking
> to achieve a purpose other than bringing an offender to justice . . . ;
> 4) the proceeding . . . terminated in favor of the person against whom it was
> brought; and
> 5) the plaintiff suffered damages as a result of the proceeding.

*Martin*, 507 S.W.3d at 11–12.  Only elements two and three—whether there was probable cause

and whether Lee acted with malice—are at issue here.[8]  The district court concluded that Lee had

probable cause and therefore did not reach the question of malice.  Having determined that Lee

lacked probable cause to initiate criminal proceedings against Scheffler for alcohol intoxication or

disorderly conduct, we must consider whether Lee acted with malice.

"Malice is a material fact that a plaintiff must prove to sustain a malicious prosecution

claim." *Martin*, 507 S.W.3d at 5.  To prevail at summary judgment, the defendant must show that

the plaintiff cannot "satisfy his burden of proving malice."  *Id.* at 6.  Malice may, in certain

circumstances, be inferred from the absence of probable cause.  *Id.* (citing *Mosier v. McFarland*,

---

[7] Scheffler does not pursue a federal malicious prosecution claim on appeal.

[8] Under Kentucky law, the issue of qualified official immunity is "superfluous" in a malicious prosecution claim against state law enforcement officers.  *Martin v. O'Daniel*, 507 S.W.3d 1, 5–6 (Ky. 2016), *as corrected* (Sept. 22, 2016).  "[T]he very same evidence that establishes the eponymous element of a malicious prosecution action simultaneously negates the defense of official immunity. . . . [I]f a plaintiff can prove that a police officer acted with malice, the officer has no immunity; if the plaintiff cannot prove malice, the officer needs no immunity." *Id.* at 5.

106 S.W.2d 641, 642–43 (Ky. 1937). But malice cannot *always* be inferred from a lack of probable

cause. As the Kentucky Supreme Court summarized:

> In an action for malicious prosecution, both malice on the part of the defendant and want of probable cause for his prosecution of the plaintiff must be alleged and proved, although malice may be inferred from proof of the absence of probable cause. The jury, however, may not invariably imply malice from the mere want of probable cause if all the facts disclosed lead to a different conclusion. If malice was to be inferred from want of probable cause alone, then there would be no necessity for having a distinct requirement that malice be proven, for want of probable cause would then be the only element necessary to be established.

*Mosier*, 106 S.W.2d at 642 (citations omitted).

Scheffler argues that Lee's statement that "we'll call it" alcohol intoxication, combined

with the absence of probable cause, permits an inference of malice; in other words, there is

sufficient evidence to permit a jury to find that Lee arrested Scheffler for a purpose "other than

bringing [him] to justice." *Martin*, 507 S.W.3d at 11. Post-arrest events, while not relevant to the

probable-cause determination, militate against a finding of malice. Lee witnessed conduct that

could have informed a subjective belief that Scheffler was under the influence of alcohol. For

example, Lee witnessed Scheffler's erratic behavior in the squad car and Scheffler's refusal to give

a urine sample at the hospital. Most importantly, Lee's demeanor in the video and audio recordings

does not evince malice. Viewed in its entirety, the record does not permit a reasonable inference

of malice. As a result, Scheffler's common law malicious prosecution claim fails.

## H.    First Amendment Claim Against Lee

Scheffler next argues that the district court improperly dismissed his First Amendment

retaliation claim. In his pro se First Amended Complaint, Scheffler alleged that Lee violated his

"clearly established right of freedom of speech and [to] petition [the] government for redress of

grievances by intentionally frustrating a 911 dispatch of a supervisor initiated at the request of the

Plaintiff and Plaintiff's subsequent arrest." The district court dismissed the claim, finding that it failed as a matter of law.

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Kennedy*, 635 F.3d at 217 (citation and footnote omitted). As to the first prong, Scheffler claims that calling 911 is constitutionally protected activity, but he provides little authority and no argument in support of this assertion.

Assuming that calling 911 qualifies as protected speech under the First Amendment, Scheffler has not mounted sufficient evidence showing that his arrest "was motivated at least in part by [that] protected conduct." *Id.* (citation omitted). A plaintiff need not present direct evidence of motive; "circumstantial evidence may provide sufficient evidence of retaliatory intent to survive summary judgment." *Id.* at 218 (citation omitted). In *Kennedy*, the record contained evidence that the plaintiff was angry with the defendant (a police officer), that the defendant "came running back in to the building, got in [the plaintiff's] face, and arrested [the plaintiff] immediately after [the plaintiff] called [the defendant] a fat slob." *Id.* at 219 (citation and internal quotation marks omitted). We relied on this sequence to conclude that the plaintiff's speech—insulting a police officer—"may have been a motivating factor" in his arrest. *Id.* Scheffler argues that the "quick sequence of events" in his case—Scheffler making the 911 call, Lee cancelling the dispatch, Lee threatening Scheffler with arrest, and Lee arresting Scheffler—creates a dispute of fact with respect to Lee's motivation. Proximity in time can support an inference of a causal link. *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776–77 (6th Cir. 2018). The record here, however, does not permit a reasonable jury to infer that Lee arrested Scheffler because of the 911

call—as opposed to, for example, perceived alcohol intoxication, disorderly conduct, or even Scheffler's refusal to cooperate with Lee. The district court did not err in dismissing Scheffler's First Amendment claim against Lee.

## I.        Kentucky Common Law Battery Claim Against Carroll

Finally, we turn to Scheffler's battery claim against EMT Carroll. Scheffler alleges that Carroll punched him in the chest while Scheffler was in an ambulance being transported to the hospital following his arrest. Carroll responds that he performed a medical procedure known as a sternum rub because Lee had become unresponsive.

Lack of consent "is an essential element of battery" under Kentucky law. *Vitale*, 24 S.W.3d at 658. Consent may be "either expressed or implied from the circumstances." *Hoofnel v. Segal*, 199 S.W.3d 147, 150 (Ky. 2006). An exception to the consent requirement exists in "emergency or life threatening situation[s]." *Id.* Thus, if Carroll had either express or implied consent, or was providing medical care in an emergency situation, Scheffler's battery claim fails.

Carroll, in his sworn statement to the PSU, testified that he gave Scheffler a sternum rub— a medical procedure in which the provider makes a fist and presses his knuckles against an unresponsive patient in an attempt to rouse him. Carroll apparently believed the procedure was medically necessary because Scheffler had put his head down, closed his eyes, and stopped responding to Carroll's questions or to any stimuli for over a minute. At the time, Scheffler was in the back of an ambulance after repeatedly asking to be taken to the hospital and reporting that he felt as though he was having a heart attack.

Scheffler claims that Carroll punched him in the chest but offers no evidence that would substantiate his assertion that it was a punch rather than a sternum rub. His complaint even refers to Carroll's action as a sternum rub rather than a punch. Scheffler further admits that his eyes were

closed at the time, rendering him unable to see Carroll's actions, and he does not dispute Carroll's testimony that he had put his head back as well. Scheffler does deny that he stopped responding to Carroll and testified that he does not remember Carroll giving him a loud verbal command or nudging him before giving him the sternum rub.

Scheffler has not presented sufficient evidence to survive summary judgment on his battery claim against Carroll. Scheffler consented to medical care by asking to be taken to the hospital and by willingly entering the ambulance with the EMTs, and there is no indication that Scheffler withdrew or limited that consent. Carroll performed the sternum rub as part of that care. Furthermore, Carroll was treating Scheffler in an emergency situation: Scheffler was in the back of an ambulance, had claimed to be having a panic attack, and had stated that he felt as if he was having a heart attack. Under the circumstances, Carroll acted reasonably in conducting a sternum rub, and the district court properly granted summary judgment on Scheffler's battery claim.

## III.  CONCLUSION

For the reasons explained above, we **AFFIRM** the grant of summary judgment to Carroll; **AFFIRM** the grant of summary judgment on Scheffler's excessive force, battery, common law malicious prosecution, and First Amendment claims against Lee; **REVERSE** the grant of summary judgment on Scheffler's false arrest and false imprisonment claims against Lee, and **REMAND** to the district court for further proceedings consistent with this opinion.